TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-98-00140-CV






Olin Corporation, Appellant



v.



Debra and Ricky Smith, Individually and For the Use and Benefit


of Their Minor Son, Joshua Smith, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT


NO. 97-08047, HONORABLE PAUL DAVIS, JUDGE PRESIDING 







 Debra and Ricky Smith, and their son Joshua Smith, sued Olin Corporation for
marketing defective ammunition and for failing to issue a warning to users that the ammunition
was subject to delayed firing. After a bench trial, the trial court rendered judgment in favor of
Debra and Ricky Smith for $193,764 in actual damages and $19,376 in prejudgment interest, for
a total of $213,140. The trial court rendered judgment in favor of Joshua Smith for $5,766,772
in actual damages and $576,672 in prejudgment interest, for a total of $6,343,444. By two points
of error, Olin Corporation contends the trial court erred by: (1) rendering judgment for the Smiths
in the absence of evidence to support the judgment and (2) awarding damages to Joshua Smith
substantially in excess of full and fair compensation. We will affirm the trial court judgment.

THE CONTROVERSY


 On the night of March 13, 1996, Joshua Smith, Albert Herrington, and Albert's
brother Brandon went hunting on the Herrington family's ranch east of Mason, Texas. Albert,
age 16, drove his Ford Bronco II. Joshua, age 16, rode beside Albert while Brandon, age 14, sat
in the rear seat. During the hunt, Joshua spotted a feral pig. Albert stopped the Bronco and went
to the rear of the vehicle. While Albert stood on the tailgate and shot at the pig with his rifle and
a pistol, Joshua fired six rounds at the animal from the passenger widow using his Model 17 Smith
& Wesson .22 caliber revolver. The pig ran through a thicket. While Joshua reloaded, Brandon,
now driving, followed the pig until a clear shot was possible.

 When the boys spotted the pig again, Brandon stopped the vehicle and Albert and
Joshua resumed their shooting. Joshua illuminated the pig with a spotlight and fired four rounds. 
He then heard a "click." Assuming the revolver was empty, he brought it into the vehicle to
reload. He placed the revolver on his right thigh with its muzzle pointed toward the floorboard. 
He reached for more ammunition and the gun discharged, striking him in the left leg. Joshua
sustained serious injuries, and his leg was eventually amputated below the knee.

 Olin Corporation manufactured the .22 caliber Winchester Wildcat ammunition used
by Joshua on March 13, 1996. Olin denies that a defect in its ammunition caused the accidental
shooting. Olin's theory is that while hunting the feral pig, Joshua became overly excited, failed
to reload his revolver completely, and shot himself. Joshua and his parents argue that the cause
of the shooting was a "hangfire"--a delayed firing caused by an abnormal delay in the ignition of
ammunition propellant. Olin dismisses this explanation, arguing that it is not chemically possible
for ammunition of the type used by Joshua to hangfire for at least one second in duration--the
minimum time claimed by Joshua to have elapsed between pulling the trigger for the final time and
placing the revolver on his thigh.


DISCUSSION AND HOLDINGS


 In its first point of error, Olin Corporation argues that the expert testimony offered
by the Smiths to show that the delayed firing was caused by defective ammunition failed to meet
the admissibility requirements imposed on expert testimony by E.I. du Pont de Nemours & Co.,
Inc. v. Robinson, 923 S.W.2d 549 (Tex. 1995). Olin contends that because the Smiths' experts
presented unreliable testimony, their testimony was not competent evidence. See Maritime
Overseas Corp. v. Ellis, 971 S.W.2d 402, 409 (Tex. 1998); Merrell Dow Pharmaceuticals, Inc.
v. Havner, 953 S.W.2d 706, 713 (Tex. 1997) ("If the expert's scientific testimony is not reliable,
it is not evidence."). Accordingly, Olin argues the Smiths did not present any reliable evidence
to demonstrate that it is chemically possible for rimfire ammunition using lead styphnate primer
to hangfire, under any conditions, for more than a few hundred milliseconds.

 The issue before us is not whether the Smiths' witnesses possessed adequate
credentials, skills, or experience to testify about causation. The Smiths produced three experts
on delayed firings caused by defective ammunition: Bill Wiseman, Reeves Jungkind, and Lester
Roane. The record shows that Olin objected to Mr. Wiseman's testimony based on his alleged
lack of expertise in ammunition. The trial judge overruled this objection. Olin did not challenge
the qualifications of the other two experts and does not complain that the trial judge's ruling
concerning Wiseman's qualifications was erroneous.

 Instead, Olin argues that the experts' testimony was unreliable and cannot be
considered evidence of probative force to support the judgment. In its findings of fact in support
of the judgment, the trial court found that "[t]he manner in which the accident happened
establishes that a 'hang fire' occurred, that is, there was a delay between the time the firing pin
struck the rim-fire cartridge and the firing of the cartridge."

 We note initially that although the case was tried to the court, we review a trial
court's findings of fact by the same standards applied in reviewing evidence supporting a jury's
verdict. Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994). In reviewing the evidence under
a "no evidence" point of error, we consider all the evidence in the light most favorable to the
prevailing party, indulging every reasonable inference in that party's favor. See Associated Indem.
Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 285-6 (Tex. 1998); Havner, 953 S.W.2d at
711. We will uphold the finding if there is more than a scintilla of evidence to support the finding. 
Catalina, 881 S.W.2d at 297. The evidence supporting a finding amounts to more than a scintilla
if reasonable minds could arrive at the finding given the facts proved in the particular case. 
Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995); William Powers, Jr. & Jack
Ratliff, Another Look at "No Evidence" and "Insufficient Evidence," 69 Tex. L. Rev. 515, 522
(1991).

 In accordance with the requirements of the "no evidence" standard of review, we
will now consider the evidence, beginning with the testimony of the three eyewitnesses. Albert
Herrington testified that he "distinctly" remembered hearing Joshua's gun click once before Joshua
pulled the gun into the Bronco. Brandon Herrington testified that he heard Joshua's gun click
while watching Joshua shoot at the pig. He saw Joshua bring the gun back into the Bronco and
place it on his thigh. Brandon testified that Joshua's hand was not on the gun when it discharged. 

 Joshua testified that he fired four rounds at the pig before he heard the revolver
click. He testified that he was positive the hammer of the revolver was down when he laid the gun
on his thigh. He further testified that once he laid the revolver down, he removed his hand from
it and did not pull the trigger. Joshua testified that the gun discharged while he was reaching for
more ammunition.

 Louis Herrington, Albert and Brandon's father, testified that while transporting
Joshua to the Mason Clinic after the shooting, he asked Joshua how he had gotten shot. Louis
testified that Joshua told him that while shooting at a pig, his gun had clicked. He brought the gun
inside the vehicle to reload, and the gun discharged while he was reaching for ammunition. Louis
also testified that when he questioned Albert and Brandon later that evening, they corroborated
Joshua's version of the events; specifically, Albert heard the click and Brandon told his father that
Joshua's hand was not on the revolver when it discharged.

 Because the testimony of all three eyewitnesses was substantially the same, Olin
staked its defense on the testimony of its two expert witnesses: Paul Szabo and Charles Fagg. 
Szabo, an employee of the Olin Corporation with a bachelor's degree in mechanical engineering,
testified that when a gun's firing pin strikes a cartridge, a chemical reaction takes place. The
firing pin pinches a portion of the lead styphnate primer. The priming mix explodes, generating
a flame that engulfs the primer and ignites the propellant. This creates pressure that pushes the
bullet out of the cartridge and down the barrel of the gun. Szabo testified that cartridges normally
fire in two to four milliseconds. He also testified that due to the danger associated with delayed
ignitions, Olin has a safety policy at its test range requiring the shooter to point the gun downrange
for a minimum time duration of at least ten seconds in the event he pulls the trigger, the hammer
falls, and nothing happens. 

 Szabo testified that of all the millions of rounds of ammunition Olin has tested over
the years, not one has ever resulted in a hangfire unless it was contaminated in some way. Szabo,
relying on conclusions published by Lucien Haag in a trade journal article entitled To Create a
Hangfire, further testified that even contaminated lead styphnate ammunition will fire in 200 to
250 milliseconds. Szabo concluded that ammunition-related hangfires of the duration claimed by
the Smiths cannot occur in modern, lead styphnate ammunition.

 Charles Fagg, a mechanical engineer employed by Tioga Engineering, testified that
"[a] hang fire is a term applied to a situation in which there is an unreasonably lengthy delay
between the time the primer is struck and the time the bullet exits the bore." He testified that
ammunition-related hangfires can occur in ammunition with modern primers. He also testified that
there was no defect in Joshua's revolver that could have produced a hangfire. Nonetheless, Fagg
blamed the accidental shooting on Joshua rather than defective ammunition.

 Fagg opined that the revolver's over-sized grip impeded the ejection of three
cartridges; therefore Joshua reloaded only three of the six chambers. Fagg theorized that Joshua
fired one live round, heard three "clicks" as the revolver's hammer fell successively on each of
the three cases that had already been fired, and brought the revolver, which still contained two live
rounds, back into the Bronco. Fagg testified that, in his opinion, Joshua hurriedly attempted to
reload and in doing so pulled the trigger and fired the gun.

 Fagg based his opinion on the depth of the firing pin indentations on each of the five
cartridges that had been fired. The three cartridge cases to the left of the round that injured Joshua
displayed deeper firing pin indentations than the other two rounds that had been fired. Fagg
theorized that Joshua, after reloading only three cartridges and firing one live round, pulled the
trigger on three empty cartridges, resulting in "double strikes" and deeper indentations.

 To refute the testimony of Olin's expert witnesses, the Smiths called three experts
to testify concerning the occurrence of ammunition-related hangfires: Bill Wiseman, Reeves
Jungkind, and Lester Roane. In the opinion of these experts, the delayed firing that resulted in
Joshua's injuries could not have been caused by the revolver for two reasons: (1) the revolver was
examined and no defect capable of causing a weapon-related hangfire was discovered and (2) once
the trigger of the revolver has been pulled and the hammer is down, it is not physically possible
for the revolver to cause a cartridge to fire. Olin agreed that the revolver was not at fault. 

 The Smiths' experts also ruled out Joshua as the cause of the accident. Wiseman,
a registered gunsmith, had served as gunsmith to the United States Olympic shooting team, the
United States shooting team at the Pan American Games, and the elite United States Marine Corps
rifle and pistol teams. He also personally designed and built the first 138 models of the M40AM
sniper rifle, now issued to all United States Marine Corps snipers. He testified that the trigger of
Joshua's revolver must be deliberately pulled in order to fire the weapon; hence, rubbing the
trigger on clothes would not cause the gun to discharge. Roane, the chief engineer at a privately
owned small arms and ammunition research laboratory, was questioned concerning Charles Fagg's
conclusion that Joshua shot himself as he hurriedly attempted to reload. Roane tested Fagg's
theory by firing six rounds in Joshua's gun and attempting to eject three spent rounds. Roane
testified that the revolver's grip did not impede the unloading process--all six spent rounds were
ejected. Both Wiseman and Jungkind, a retired Texas Department of Public Safety officer,
duplicated Roane's unloading test while on the witness stand, and neither expert found that the grip
impeded free ejection of the casings. Moreover, Roane testified that he fired 385 rounds of
Joshua's ammunition one time each in Joshua's revolver and measured the firing pin indentations
on all 385 rounds. This test produced indentations as deep as, or deeper than, the alleged "double
strike" indentations reported by Fagg. Finally, while Fagg was on the witness stand and under
cross-examination, he could never demonstrate how his theory could have occurred. When Fagg
attempted to replicate the accidental shooting as he theorized it, it was necessary for him to
manually pick the cartridges out of the revolver in order to leave three spent shells in the chamber.

 All three of appellees' experts further testified that hangfires related to ammunition
defects occur and are a recognized danger. Wiseman testified that several ammunition reloading
treatises define the term "hangfire" as something unrelated to mechanical firearm defects. 
Furthermore, he testified that hangfires occur with sufficient frequency that the Olympics, the Pan-American Games, and armed forces competitions have rules that address what to do when a
hangfire occurs in competition. As a firearms instructor in the armed forces, Wiseman taught
hangfire procedures to all his students. All of the firing ranges used by the armed forces, he
testified, have hangfire procedures. Wiseman also testified that he personally experienced a
hangfire while test-firing .22 caliber ammunition. He stated, "And as I was shooting it, the
hammer went down, clicked, I took the pistol and I laid it right on the table. And just as I laid
it on the table, it went off, went through the window and into a car radiator."

 Jungkind testified that in his twenty-five years as a firearms training officer with
the Department of Public Safety, he trained approximately 7000 cadets how to safely use firearms. 
As part of their training, Jungkind warned the cadets about the danger of hangfires, which he
defined as "the ignition in a round of ammunition which has a longer than normal delay after the
firing pin hits the primer." Jungkind testified that a specific hangfire rule was in effect at the DPS
Training Academy requiring cadets to "keep holding that gun at arm's length for at least ten
seconds." He also testified that he has trained officers using the same type revolver and
ammunition as that involved in the instant lawsuit. Jungkind testified that he personally
experienced several second-and-a-half to two-second hangfires while firing modern ammunition
using lead styphnate primer.

 Roane, the chief engineer for H.P. White Laboratory, the world's largest and oldest
independent testing laboratory for guns and ammunition, testified that hangfires from modern
ammunition are recognized in the industry and that, "Every organized shooting operation I have
ever gone to, whether it was a commercial range or military, when I was in the military, or a test
range has always had a hangfire policy." At the ammunition research laboratory where he works,
the hangfire policy requires shooters to keep a gun pointed downrange for thirty seconds in the
event they pull the trigger and nothing happens except that the hammer falls. Roane further
testified that he personally experienced a hangfire lasting in the range of one-half to one second
in duration. Roane's testimony that hangfires of such a duration can and do occur was echoed by
an excerpt from a document introduced by Olin's lawyers during their cross-examination of
Roane. The Unites States Armed Services Ordinance Manual states:


A hangfire may be defined as that condition which exists when initiation of the
usual chain of events following release of the trigger sear in a loaded weapon,
(wherein the firing pin strikes the primer, the primer ignites the powder and the
powder propels the bullet), occurs at a rate slower than normal. A hangfire may
be of such short duration as to be barely detectable, or it may be several seconds
(or even minutes) in duration. 


(Emphasis added).



 Olin Corporation argues that the testimony of Wiseman, Jungkind, and Roane
concerning ammunition-related hangfires was unreliable because it was anecdotal and was not
based on any scientific tests. Therefore, Olin contends their testimony failed to meet the
admissibility requirements of Robinson and should not have been admitted.

 Olin Corporation first attempted to exclude appellees' expert testimony by way of
a pretrial motion. See Ellis, 971 S.W.2d at 409 ("To preserve a complaint that scientific evidence
is unreliable and thus, no evidence, a party must object to the evidence before trial or when the
evidence is offered."). The trial court did not rule on this motion before trial. At trial, Olin
reminded the court of its pending motion during the testimony of each of appellees' three expert
witnesses. Olin also objected to any testimony by those experts concerning hangfires. After the
trial court rendered judgment in favor of the Smiths, Olin filed a motion seeking a ruling on its
pretrial motion. After signing an amended judgment, the trial court denied Olin's pretrial motion
to exclude appellees' expert testimony. 

 In Olin's motion to exclude appellees' expert testimony that an ammunition-related
hangfire was to blame for Joshua's injury, Olin contended that the testimony was "scientifically
unreliable." Olin listed the criteria for admissibility set out in Daubert v. Merrell Dow
Pharmaceuticals, 509 U.S. 579 (1993), and adopted by Robinson and argued that the testimony
of Wiseman, Jungkind, and Roane failed to meet even one of the six factors. Olin's exclusive
reliance on the admissibility criteria of Robinson is misplaced.

 Rule 702 permits a witness qualified by knowledge, skill, experience, training, or
education to testify on scientific, technical, or other specialized subjects if the testimony would
assist the trier of fact in understanding or determining a fact issue. Tex R. Evid. 702 (emphasis
added). In Robinson, the Texas Supreme Court adopted the test for admissibility of scientific
expert testimony formulated by the United States Supreme Court in Daubert v. Merrell Dow
Pharmaceuticals, Inc., 509 U.S. 579 (1993). See Robinson, 923 S.W.2d at 556. Under Rule 702,
the trial court must determine that expert testimony is reliable, as well as relevant, before
admitting it in evidence. Id. at 557. Robinson adopted from Daubert several factors to guide the
trial court in assessing reliability of proffered testimony and making the threshold determination
of admissibility under Rule 702: (1) the extent to which the theory has been or can be tested; (2)
the extent to which the technique relies upon the subjective interpretation of the expert; (3)
whether the theory has been subjected to peer review and publication; (4) the technique's potential
rate of error; (5) whether the underlying theory or technique has been generally accepted as valid
by the relevant scientific community; and (6) the non-judicial uses that have been made of the
theory or technique. Id.

 The supreme court has made clear that the factors set forth in Robinson for
assessing the reliability of expert testimony are nonexclusive and will differ with each particular
case and the nature of the evidence offered. The court has reasoned that those factors are germane
in evaluating whether the expert is a professional witness or a person whose opinion in the
courtroom will withstand the same scrutiny that it would in the particular industry and among the
expert's professional peers.

 In Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 722-26 (Tex. 1998),
the Texas Supreme Court considered whether the Daubert/Robinson admissibility criteria should
be applied to both "scientific" and "non-scientific" expert testimony. In analyzing this question,
the court considered several federal circuit court decisions that distinguished scientific expert
testimony from non-scientific expert testimony. See Carmichael v. Samyang Tire, Inc., 131 F.3d
1433 (11th Cir. 1997), cert. granted sub nom., Kunho Tire Co. v. Carmichael, 118 S. Ct. 2339
(1998); McKendall v. Crown Control Corp., 122 F.3d 803 (9th Cir. 1997); Berry v. City of
Detroit, 25 F.3d 1342 (6th Cir. 1994). The difference between the two types of expert testimony
is that "a scientific expert is an expert who relies on the application of scientific principles, rather
than on skill- or experienced-based observation, for the basis of his opinion." Carmichael, 131
F.3d at 1435; see also Daubert, 509 U.S. at 590.

 In Berry, the challenged expert was a person who had worked for several years in
law enforcement. 25 F.3d at 1348-49. The expert sought to testify, based on his "firsthand
familiarity with disciplining police officers," about whether the city of Detroit was at fault for
failing to properly train and discipline police officers. Id. at 1348. In McKendall, the proposed
expert was a mechanical and metallurgical engineer seeking to testify, "based on his experience
as a mechanical engineer who has investigated hundreds of forklift accidents," that a forklift was
defectively designed. 122 F.3d at 804, 806. In Carmichael, the testimony in controversy
concerned the reasons a car tire failed. 131 F.3d at 1434. The challenged expert, although he
held a bachelor's and master's degree in mechanical engineering, did not base his opinion that a
design or manufacturing defect caused the blowout on any scientific theory of physics or
chemistry. Id. at 1434, 1436. Instead, he rested his opinion on his experience in analyzing failed
tires. Id. at 1436.

 Based on these decisions, the Texas Supreme Court in Gammill concluded that
while the fundamental requirements of reliability and relevance are applicable to all expert
testimony offered under Rule 702, the criteria for assessing relevance and reliability will vary
depending on the type of expert and the nature of the evidence offered. The court stated:


The considerations listed in Daubert and in Robinson for assessing the reliability
of scientific evidence cannot always be used with other kinds of expert testimony. 
To borrow the Berry court's analogy, a beekeeper need not have published his
findings that bees take off into the wind in a journal for peer review, or made an
elaborate test of his hypotheses. Observations of enough bees in various
circumstances to show a pattern would be enough to support his opinion. 


Gammill, 972 S.W.2d at 726-27.



Significantly, the court left it to the trial court in discharging its duty as "gatekeeper" to determine
how the reliability of particular testimony is to be assessed.

 Because the present case was tried to the court and the judge carried Olin's
Robinson motion to the conclusion of trial, the trial court heard extensive testimony concerning
the qualifications of the experts as well as the reliability and relevance of their testimony. As both
gatekeeper and fact-finder, the trial court was in a position to assess the reliability of the technical
and specialized knowledge proffered by the experts and to determine whether the testimony would
assist the trier of fact to understand the evidence and to determine the facts in issue as
contemplated by Rule 702. (1) The court was in a position to evaluate whether the opinion proffered
"comport[ed] with applicable professional standards outside the courtroom" and had "a reliable
basis in the knowledge and experience of the discipline" in question. Gammill, 972 S.W.2d at
726-27 (quoting Watkins v. Telsmith, Inc., 121 F.3d 984 (5th Cir. 1997)).

 The court in Gammill noted that experts may testify "about specific defects and
design changes based on years of experience with the product itself and others like it, a knowledge
of the industry, and publications on the subject" when the bases for it are shown to be reliable. 
Id. The testimony of the Smiths' experts was based on experience, training, and skill rather than
on the application of scientific principles. The trial court concluded that the testimony of the
Smiths' experts was reliable and relevant and would assist the trier of fact.

 We must not disturb that ruling absent a showing that the trial court abused its
discretion. Robinson, 923 S.W.2d at 558; see also Ginsberg v. Fifth Court of Appeals, 686
S.W.2d 105, 108 (Tex. 1985). The test for abuse of discretion is whether the trial court acted
unreasonably or arbitrarily or without reference to any guiding rules or principles. Gammill, 972
S.W.2d at 727; Robinson, 923 S.W.2d at 558; Downer v. Aquamarine Operators, Inc., 701
S.W.2d 238, 241-42 (Tex. 1985), cert. denied, 476 U.S. 1159 (1986).

 The Smiths' experts offered testimony of their technical and specialized knowledge,
based on skill, training, and experience, and explained Joshua's shooting in a manner that
corroborated the eyewitness testimony. According to the eyewitnesses, once Joshua reloaded, he
began to fire at the pig. His gun made an audible "click," and Joshua pulled the weapon back into
the Bronco to reload. The hammer of the revolver was down and Joshua's hand was not on the
revolver when it discharged. None of the eyewitnesses testified that Joshua inadvertently pulled
the trigger. Based on the eyewitness testimony and an inspection of the gun, the Smiths' experts
testified that neither Joshua nor the gun itself could have been the cause of the accident. Wiseman
testified that the trigger on Joshua's gun could be pulled only with a deliberate motion. All of the
Smiths' experts demonstrated why it was unlikely that Joshua had replaced only three of the six
spent cartridges. Furthermore, all three experts opined that ammunition-related hangfires of the
duration necessary to cause Joshua's accidental shooting can and do occur. Their opinions were
based not only on years of experience in manufacturing firearms, testing firearms, and training
others to use firearms, but on experience and actually observing ammunition-related hangfires
lasting in the range of one-half second to two seconds.

 Only Olin Corporation's experts testified to the contrary. They claimed that a
hangfire of longer than 250 milliseconds is chemically impossible. In the opinion of Olin's
experts, Joshua shot himself. This theory was refuted by the testimony of both the eyewitnesses
to the shooting and the Smiths' experts. 

 The trial court was not bound to accept the conclusions offered by either Olin's
experts or the Smiths' experts, notwithstanding Olin's contention that the opinions of its experts
were based on unalterable scientific principles. Opinion testimony does not establish any material
fact as a matter of law and is never binding on the trier of fact. See McGalliard v. Kuhlmann, 722
S.W.2d 694, 697 (Tex. 1986); Hood v. Texas Indem. Ins. Co., 209 S.W.2d 345, 346 (Tex. 1948). 
In a nonjury trial, the trial court is the sole judge of the credibility of the witnesses and the weight
to be given to their testimony. Griffin Indus., Inc. v. Thirteenth Court of Appeals, 934 S.W.2d
349, 355 (Tex. 1996). The trial court, acting as the fact-finder, is exclusively in a position to
observe the witnesses and evaluate their testimony and credibility. Id. at 355. Because the trial
court was not bound to accept Olin's theory that it is not chemically possible for rimfire
ammunition using lead styphnate primer to hangfire under any conditions for more than a few
hundred milliseconds, there was little reason for the trial court to conclude that the testimony of
the Smiths' experts was unreliable.

 Accordingly, we cannot say that the trial court erred or abused its discretion in
determining that the testimony of the Smiths' experts was reliable and admitting it in evidence. 
Because the testimony was properly admitted, it could be considered probative evidence on which
to base a judgment favoring the Smiths. We overrule appellant's first point of error.

 In its second point of error, Olin Corporation contends that the trial court erred in
awarding excessive damages to Joshua for pain and suffering and mental anguish. (2) In its amended
findings of fact, the trial court states, "Joshua Smith has sustained in the past and will sustain in
the future the following elements of damage: physical pain and mental anguish, disfigurement and
physical disability. The sum of $5,580,000 will reasonably compensate Joshua Smith for these
damages over his lifetime." 

 The standard of review for suggestions of remittitur or claims of excessive damages
is succinctly set forth in Pope v. Moore: "Factual sufficiency is the sole remittitur standard for
actual damages. In determining whether damages are excessive, trial courts and courts of appeals
should employ the same test as for any factual insufficiency question." 711 S.W.2d 622, 624
(Tex. 1986) (citations omitted). A trial court's findings are reviewable for factual sufficiency of
the evidence by the same standards we apply in reviewing evidence supporting a jury's answer. 
See Catalina, 881 S.W.2d at 297.

 Testimony at trial established that at the time of the shooting, Joshua was 16 years
of age and had a reasonable life expectancy of 55.8 years. The bullet severed his popliteal artery,
which is the primary artery supplying blood to the leg and the foot. Extensive testimony described
the months of extreme pain and mental anguish which Joshua sustained while doctors attempted
to save his leg. Because Joshua's leg never properly healed, the leg was amputated below the knee
and Joshua was fitted for a prosthesis.

 The evidence established that Joshua has undergone extensive surgical procedures
and will continue to require surgery. Joshua's prosthesis will wear out from normal use every
three to five years. Volumetric changes in the size of his partially severed leg require Joshua to
utilize wrenches in order to keep the prosthesis properly fitted. Joshua experiences severe
blistering of the skin of his leg and often complains of "phantom pain," a sensation that feels like
the toes of his amputated foot are being bent "backwards and forwards, just crunching them as
hard as they can." The trial court awarded Joshua $5,580,000 for both past and future physical
pain and mental anguish, disfigurement, and physical disability.

 After reviewing all of the evidence presented by both sides concerning Joshua's
injuries, we cannot say that the judgment is supported by evidence so weak as to make it
manifestly unjust. See Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); In re King's Estate, 244
S.W.2d 660, 661 (Tex. 1951); see also Pool v. Ford Motor Co., 715 S.W.2d 629 (Tex. 1986). 
We overrule appellant's second point of error.

 We affirm the judgment of the trial court.



 

 Jan Patterson, Justice

Before Justices Jones, Kidd and Patterson

Affirmed

Filed: February 11, 1999

Publish

1. In Robinson, the Texas Supreme Court recognized the potentially prejudicial influence on
juries of the term "expert." A witness who has been admitted by the trial court as an expert often
appears inherently more credible to the jury than does a lay witness. Consequently, a jury more
readily accepts the opinion of an expert witness as true simply because of his or her designation
as an expert. E.I. du Pont de Nemours & Co., Inc. v. Robinson, 923 S.W.2d 549, 553 (Tex.
1995). Based on the increased use of expert witnesses and the potential prejudicial impact of their
testimony, the court concluded that "trial judges have a heightened responsibility to ensure that
expert testimony show some indicia of reliability." Id. These concerns are somewhat reduced in
a trial to the court. Here, the confluence of the "gatekeeper" and fact-finder functions in the trial
court served to ventilate fully any Robinson issues.
2. We will assume without deciding the issue that Olin preserved its complaint of excessive
damages for appellate review. Olin declined to address each element of the damages with
sufficient particularity to challenge the damage award. Instead of contesting the evidence
underlying the amount of the award, Olin argues only that the total amount is excessive compared
to other awards for comparable injuries.


 damage: physical pain and mental anguish, disfigurement and
physical disability. The sum of $5,580,000 will reasonably compensate Joshua Smith for these
damages over his lifetime." 

 The standard of review for suggestions of remittitur or claims of excessive damages
is succinctly set forth in Pope v. Moore: "Factual sufficiency is the sole remittitur standard for
actual damages. In determining whether damages are excessive, trial courts and courts of appeals
should employ the same test as for any factual insufficiency question." 711 S.W.2d 622, 624
(Tex. 1986) (citations omitted). A trial court's findings are reviewable for factual sufficiency of
the evidence by the same standards we apply in reviewing evidence supporting a jury's answer. 
See Catalina, 881 S.W.2d at 297.

 Testimony at trial established that at the time of the shooting, Joshua was 16 years
of age and had a reasonable life expectancy of 55.8 years. The bullet severed his popliteal artery,
which is the primary artery supplying blood to the leg and the foot. Extensive testimony described
the months of extreme pain and mental anguish which Joshua sustained while doctors attempted
to save his leg. Because Joshua's leg never properly healed, the leg was amputated below the knee
and Joshua was fitted for a prosthesis.

 The evidence established that Joshua has undergone extensive surgical procedures
and will continue to require surgery. Joshua's prosthesis will wear out from normal use every
three to five years. Volumetric changes in the size of his partially severed leg require Joshua to
utilize wrenches in order to keep the prosthesis properly fitted. Joshua experiences severe
blistering of the skin of his leg and often complains of "phantom pain," a sensation that feels like
the toes of his amputated foot are being bent "backwards and forwards, just crunching them as
hard as they can." The trial court awarded Joshua $5,580,000 for both past and future physical
pain and mental anguish, disfigurement, and physical disability.

 After reviewing all of the evidence presented by both sides concerning Joshua's
injuries, we cannot say that the judgment is supported by evidence so weak as to make it
manifestly unjust. See Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); In re King's Estate, 244
S.W.2d 660, 661 (Tex. 1951); see also Pool v. Ford Motor Co., 715 S.W.2d 629 (Tex. 1986). 
We overrule appellant's second point of error.

 We affirm the judgment of the trial court.