**AMERICAN INTERSTATE INSURANCE COMPANY,**
Appellant,

v.

**William E. HINSON, Appellee.**

No. 09–04–369 CV.

Court of Appeals of Texas, Beaumont.

Submitted on June 16, 2005.

Decided Aug. 11, 2005.

Robert T. Cain, Jr., Joseph M. McElroy, Zeleskey, Cornelius, Hallmark, Roper & Hicks, LLP, Lufkin, for appellant.

Gerald K. Payte, Gloria J. Kologinczak, Payte & Kologinczak, PLLC, Houston, for appellee.

Before GAULTNEY, KREGER and HORTON, JJ.

## OPINION

HOLLIS HORTON, Justice.

▮ Is the evidence in this workers' compensation case sufficient to support the jury's finding that William E. Hinson was not intoxicated at the time of his injury? We review all of the evidence admitted at the trial to evaluate if the jury's verdict should be affirmed.[1]

### HINSON'S EVIDENCE REGARDING INTOXICATION

While employed by Constructors and Erectors (C & E) and working with fellow employees as a steel connector on a raising gang at the Abitibi paper mill in Lufkin, Texas, Hinson fell from a steel structure. Hinson had approximately four or five years of experience in his trade prior to his injury. Hinson worked for C & E for

---

1. *City of Keller v. Wilson,* 168 S.W.3d 802, at 808 (Tex. 2005).

only four days prior to his injury. Hinson's work on the morning of the accident began around 7:30 a.m., and he fell at approximately 11:45 a.m. Prior to the accident, Hinson had no problems doing his work, and had worked atop the structure being constructed all morning without coming down for a break.

Just prior to the fall, Hinson and a co-worker detached a steel clip that weighed 75 to 80 pounds from the end of a steel cross-piece while sitting on horizontal beams above ground level. Unfortunately, Hinson neglected to re-attach his safety lanyard after moving to the point where he sat on the beam. Hinson attempted to excuse his failure to tie his safety lanyard to a safe structure to an alleged exception to the general tie off rules while working under overhead loads, and to helping his co-worker remove the clip.

When Hinson and his co-worker removed the heavy clip from the steel cross-piece attached to a crane, the end of the cross-piece where Hinson sat swung up and struck him in the face. Hinson was unaware that bolts he had previously secured attaching the opposite end of the cross-piece had been removed by a co-worker. When Hinson removed the clip, the end where he was working swung up and struck him. Hinson fell to the ground, and next recalled waking up in the hospital a few days later.

Hinson testified that prior to his injury that morning he felt normal, and he had no trouble aligning the beams in the structure. Prior to the fall, Hinson's work required him to rely on his balance and walk across beams approximately thirty to thirty-five feet above the ground.

Hinson also testified at trial regarding his use of marijuana. He began using marijuana for recreational purposes at age fifteen, and then began to use marijuana regularly about a year later. Hinson stated that regular use meant that he used marijuana two to three times per week, and as much as daily. Hinson testified that when he began working as a steel connector, he continued to use marijuana regularly but did not normally use marijuana on weekdays. Hinson testified that he never used marijuana while on a job, or before he went to a job. Hinson testified that when he did smoke marijuana after work, he smoked, on average, three to five joints. Hinson denied that smoking three to five joints made him drunk. Hinson testified that he felt the effects of the marijuana five to ten minutes after smoking a joint, and that the effect of the marijuana lasted 25 to 30 minutes.

According to Hinson, on the morning after using marijuana he felt no different than on a morning where he had not smoked marijuana. Hinson testified that the marijuana relaxed him mentally, but he denied that marijuana ever affected him physically. Hinson testified that he used marijuana on a regular basis for four years prior to his accident.

Hinson addressed the effect of his marijuana use at the time of the accident. He denied smoking any marijuana during the two days prior to the incident. On the morning of the incident, a Wednesday, Hinson testified that he felt alert and denied that he suffered from any physical or mental impairment. Hinson testified that no one complained that he was not working at a normal speed, and no one on the morning of the incident criticized his work performance. Nevertheless, Hinson admitted there was marijuana in his system a the time of the injury. Hinson admitted that he smoked marijuana on the week-end before his accident, but could not recall how many joints he smoked the week prior to his accident. Hinson admitted that the urine sample taken after the accident tested positive for marijuana. Hinson pre-

sented no expert witness testimony regarding whether his marijuana use would have caused mental or physical impairment. Hinson was the sole witness called to testify on his behalf.

## AMERICAN INTERSTATE'S EVIDENCE REGARDING INTOXICATION

American Interstate called three witnesses to testify before the jury. Its first witness, Elmo Hall, Jr., testified that he was C & E's foreman on the job at the time of the accident. Hall estimated that Hinson was working twenty-five to thirty feet above the ground prior to the fall.

Hall explained that at the time of the accident, Hinson and another C & E employee were attempting to place a T-brace into position while it was held in place by a crane. Hall agreed that the workers needed to swap out a clip on a piece of steel to correct a problem encountered in fitting the steel together.

Hall testified that under the conditions on the day of the incident there were no excuses for Hinson's not tying off the safety lanyard. Hall disputed Hinson's testimony that there was other steel suspended above Hinson in the structure prior to the accident. Hall testified that immediately prior to the fall, he observed Hinson walk across a beam without being tied off. Because Hall was concerned that if he yelled he might distract Hinson, Hall began to walk toward the structure to correct Hinson's failure to follow the safety rules requiring workers at elevations to be tied off safely. Just as Hall reached the structure, Hinson fell to the ground.

Hall testified that Hinson's failure to tie off violated the company's safety policy, and the violation was not normal behavior. Hall gave no testimony that Hinson appeared intoxicated at any time prior to the accident, and described no other incidents involving Hinson that might have evidenced any impairment in Hinson's normal use of his mental or physical faculties. On cross-examination, Hall admitted that Hinson had been tied off all day prior to this incident, and was doing his job.

Robert Marsh, a safety director, was American Interstate's second witness. Marsh investigated Hinson's accident and concluded that the cause of the accident was Hinson's failure to use his safety lanyard. Marsh testified that Hinson's failure to tie off under the circumstances violated company policy. Marsh also testified that his investigation was inconclusive about whether the cross-piece hit Hinson prior to his fall.

In addition, Marsh identified the post-accident urinalysis, and testified that employees were required to consent to post-accident testing as a condition of employment. At some time after the accident, Marsh testified that he was advised the urinalysis showed 264 nanograms per milliliter of marijuana metabolite in Hinson's urine. Marsh did not testify regarding when the urinalysis sample was taken, or provide any opinions about whether the urinalysis showed impairment at the time of the accident.

The third witness called by American Interstate was Dr. Thomas Kurt. Dr. Kurt, a physician specializing in medical toxicology, has been licensed to practice medicine in Texas since 1978. Dr. Kurt indicated that one-third of his time is spent preparing to testify or testifying in matters regarding causes of injury or death where toxicology is an issue.

Dr. Kurt stated that he was familiar with the definition of intoxication under the Texas Labor Code, and that based on reasonable medical probability, Hinson was intoxicated under the meaning of the term as defined by the Labor Code at the

time of his injury. There were no objections to Dr. Kurt's testimony that Hinson was intoxicated at the time of the accident.

Dr. Kurt testified that his opinion was based on the proper collection of a urine specimen within a few hours of the accident. Dr. Kurt noted that the urinalysis was performed with a gas chromatography mass spectrometry technique that he described as state-of-the-art. Also, in forming his opinion, he looked for circumstances that could have interfered with the urinalysis results. Finally, Dr. Kurt testified that his opinion was also based on his experience and the relevant scientific literature regarding the quantity of marijuana sufficient to cause impairment. None of the scientific literature upon which Dr. Kurt relied is contained in the record.

Dr. Kurt testified that, in his opinion, Hinson's impairment at the time of the accident was mental, but not physical. Dr. Kurt indicated that studies showed a relationship between impairment in mental function and marijuana use. Dr. Kurt testified that chronic marijuana users suffer an impairment in mental function.

Because the level of marijuana metabolite reported in the urinalysis test result was fairly significant, Dr. Kurt questioned Hinson's history in which Hinson had denied smoking marijuana for two days prior to the incident. Dr. Kurt explained that a urinalysis test result of 100 to 150 is typical in a subject tested two to three hours after smoking one joint of marijuana. Dr. Kurt also indicated that addicts are not usually reliable historians, and that their histories of drug use are usually understated.

With respect to whether the urine test result demonstrated that Hinson was impaired, Dr. Kurt testified that there was a consensus between two of his toxicological colleagues and himself that impairment begins at a level of 100 nanograms of marijuana metabolite per milliliter. Dr. Kurt opined that at the level of 264 nanograms per milliliter, as shown on Hinson's urine test, there was no question on his impairment.

On cross-examination, Dr. Kurt explained that the metabolite in the urine is inactive from a psychoactive standpoint. At the point the metabolite is in the urine, it does not affect the brain. In heavy marijuana users, the metabolite can stay in the urine for up to two weeks or longer before being completely out of the system.

At one point, Dr. Kurt indicated studies existed that showed some individuals with no loss of mental or physical function with urinalysis results of between 1085 to 2700. Dr. Kurt then attempted to limit his response and assert that these studies did show some mental deficits in individuals testing positive at these levels. Dr. Kurt acknowledged an anecdotal report in *The Journal of Forensic Sciences* of a patient with a urinalysis result of 2700, who, on observation, appeared unimpaired. Dr. Kurt pointed out that this anecdotal report was not a peer reviewed study or widely accepted in the field of toxicology.

Dr. Kurt testified that although one could measure the active chemical produced by marijuana in the blood, there were studies that extrapolated the level of active chemicals in the blood from urine tests. Dr. Kurt conceded that because the chemicals that lead to the presence of marijuana metabolite in the urine are stored in organs and body fat, it would be important to know the blood level of the active ingredient in marijuana. Nevertheless, Dr. Kurt did not testify to the level of active chemicals from marijuana use in Hinson's blood either at the time of the test, or the time of the accident, based upon Hinson's urinalysis test result.

To explain why no testing for marijuana had been done on Hinson's blood, Dr. Kurt testified that blood testing is not routinely done in employee testing programs and no blood tests were submitted to him in this case. Dr. Kurt did not recall reviewing any information that indicated Hinson's blood was tested for marijuana's active ingredients.

Dr. Kurt agreed that he had never conducted a scientific study on the effects of marijuana. Dr. Kurt testified that he did not need to know Mr. Hinson's normal physical or mental capacity, and, despite the absence of a blood test, he stated that he could base an opinion regarding Hinson's impaired capacity on the urine test results and Hinson's history of marijuana use.

American Interstate then re-called Hinson. American Interstate's attorney re-examined Hinson regarding his historical use of marijuana, and attempted to show that Hinson's testimony at trial regarding his use of marijuana had changed from his previous testimony before the hearing officer at the administrative trial of his claim. In summary, Hinson's credibility regarding the accuracy of his history of marijuana use was a hotly contested evidentiary issue.

## STANDARD OF REVIEW

■ The jury, after being presented the evidence in the trial, found that Hinson was not intoxicated at the time of his injury. Because Hinson's claim was denied at the administrative level, Hinson had the burden of proving by a preponderance of the evidence that he was not intoxicated at the time of the accident. TEX. LAB.CODE ANN. § 410.303(Vernon 1996).

In reviewing the jury's verdict for the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the prevailing party "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not."[2] Thus, we must credit favorable evidence for Hinson if reasonable jurors could, and disregard evidence contrary to the jury's finding that Hinson was not intoxicated unless reasonable jurors could not.

## INTOXICATION UNDER THE COMPENSATION ACT

■ The workers' compensation laws of Texas prohibit the recovery of compensation where, at the time of the injury, the employee is intoxicated. TEX. LAB.CODE ANN. § 406.032(1)(A) (Vernon 1996). Section 401.013(a) of the Labor Code defines intoxication as the state of:

(1) having an alcohol concentration to qualify as intoxicated under Section 49.01(2), Penal Code; or

(2) not having the normal use of mental or physical faculties resulting from the voluntary introduction into the body of:

(A) an alcoholic beverage, as defined by Section 1.04, Alcoholic Beverage Code;

(B) a controlled substance or controlled substance analogue, as defined by Section 481.002, Health and Safety Code;

(C) a dangerous drug, as defined by Section 483.001, Health and Safety Code;

(D) an abusable glue or aerosol paint, as defined by Section 485.001, Health and Safety Code; or

2. *City of Keller,* 168 S.W.3d at 808; *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998).

(E) any similar substance, the use of which is regulated under state law. TEX. LAB.CODE ANN. § 401.013(a) (Vernon Supp.2005).

■ Since marijuana was the substance at issue, and is a controlled substance under Section 481.002 of the Health and Safety Code, the relevant section of the Labor Code for this appeal is Section 401.013(a)(2)(B). In cases involving marijuana or controlled substances, there is no per se level or test defined by the statute that establishes when a person is intoxicated. The statutory standard for marijuana is relatively subjective because intoxication is defined as "not having the normal use of mental or physical faculties" because of one's voluntarily using marijuana. See TEX. LAB.CODE ANN. § 401.013(a)(2) (Vernon Supp.2005).

■ As a result of the statutory definition of intoxication, the issue in a compensation case involving marijuana is not whether marijuana was to some degree, however slight, in the claimant's body at the time of the accident. Also, the issue is not whether a lab test showed a fairly significant amount of a marijuana marker in a claimant's urine at some point *after* the accident, although this evidence could be relevant to whether a claimant was physically or mentally impaired *at the time* of the accident. Rather, the issue is whether the claimant was intoxicated when the accident occurred.

The trial court provided the following definition of "intoxication" to the jury in the jury charge: "[I]ntoxication means the state of not having the normal use of mental or physical faculties resulting from the voluntary introduction into the body of marijuana. Normal use of mental and physical faculties is to be judged by whether or not Plaintiff could or could not use his faculties in a manner that a normal, non-intoxicated person would be able to."

No party challenges the definition submitted. The issue submitted by the court along with this definition inquired whether Hinson was intoxicated at the time of the injury.

## LEGAL SUFFICIENCY

■ Hinson's testimony provided some evidence that he had the normal use of his physical and mental faculties at the time of the injury. American Interstate did not object to Hinson's testimony regarding his subjective mental and physical status. American Interstate cites no cases, nor have we found any, indicating that, under the subjective test for intoxication established by the statute in a compensation case, the testimony of an expert is required.

American Interstate argues that the expert testimony of Dr. Kurt is conclusive on whether Hinson was intoxicated at the time of the injury. American Interstate asserts that expert testimony is generally necessary in a case involving intoxication due to the ingestion of marijuana, and cites as authority for this proposition *Smithhart v. State,* 503 S.W.2d 283 (Tex.Crim.App. 1973).

*Smithhart* is distinguishable from the issue presented in this case. In *Smithhart,* the Court upheld a trial judge's evidentiary ruling excluding testimony from a police officer. 503 S.W.2d at 285. The police officer would have testified that a driver was under the influence of Valium based upon the officer's observations of the driver prior to and after a traffic stop. *Id.* The Court's opinion reflects that the proponent of the officer's opinion did not lay a proper predicate to show the officer was familiar with the effects of taking Valium on one's ability to drive before offering the officer's testimony. *Id.* at 285 n. 1. Because no predicate was laid prior

to the officer's opinion being offered, the trial judge excluded the officer's opinion regarding whether taking Valium affected the driver's ability to drive his car. Without any other opinion evidence in the case to establish that the driver was intoxicated, the court reversed a jury finding of intoxication. *Id.* at 286.

In *Smithhart,* the Court cites *Pointer v. State,* 467 S.W.2d 426 (Tex.Crim.App. 1971). *Id.* at 285. In *Pointer,* the Court found no reversible error where there had been no objection to testimony regarding the fact that a defendant appeared to be under the influence of narcotics. 467 S.W.2d at 428. The Court also found no error in the admission of the testimony of a witness that the defendant appeared to be under the influence of narcotics where a proper predicate was laid that the witness had experience dealing with persons under the influence of narcotics. The court sustained a jury verdict based, in part, on the testimony admitted without objection. *Id.* This case is more similar to *Pointer,* than it is to *Smithhart,* because as in *Pointer* there was no objection to the witness's testimony.

*Smithhart* is also distinguishable because the ultimate issue was whether the driver was intoxicated, whereas the issue in Hinson's case is whether Hinson was not intoxicated. The proffered testimony in *Smithhart* was a lay witness's testimony that another person was intoxicated, and here, the proffered testimony is from a witness who ingested an illegal substance and testified to the effects of the substance on him. Potential evidentiary problems that may exist with respect to persons testifying to the effect of drugs on others, including the necessity to lay a proper predicate under Tex.R. Evid. 602, are completely different from whether the opinion testimony of the person who ingested the substance is rationally based on his per-

ception under Tex.R. Evid. 701. In summary, even over objection, it is usually much easier to lay a predicate for testimony from a witness with personal knowledge than from a person who is an observer. We need not decide the question, however, because there was no objection to Hinson's testimony. Although the evidence that Hinson had normal use of his faculties was controverted, the jury was entitled to believe Hinson's testimony, together with the other circumstantial evidence that was consistent with Hinson's contention that he was not mentally or physically impaired at the time of the accident. In addition to Hinson's testimony, the record included testimony about the work activities Hinson successfully completed prior to his fall, including evidence that Hinson worked at heights requiring him to walk on steel beams while carrying up to eighty pounds.

Although not directly on point, this Court has addressed whether expert testimony is required in criminal cases involving alcohol in order to prove intoxication. In *Letner v. State,* 138 S.W.3d 539 (Tex. App.-Beaumont 2004, no pet.), the sole witness was a Department of Public Safety trooper who testified to his observations of Letner during a traffic stop, and who concluded that Letner did not have the normal use of his mental and physical faculties. *Letner,* 138 S.W.3d at 541. No evidence was introduced as to Letner's blood alcohol level. The jury convicted Letner of driving under the influence of alcohol, and Letner argued on appeal that the evidence consisting of the observations of the police officer and a videotape showing that he had diminished control over his mental and physical faculties was insufficient to support his criminal conviction. *Id.* at 541. In discussing its decision to uphold the jury's verdict against a sufficiency of evidence challenge, this court stated, "Unlike blood alcohol content, use of mental and physical faculties is patently observa-

ble and does not absolutely require scientific testing in order to be established." *Id.* at 542.

Thus in a case of alcohol intoxication, in which the State bases its theory on statutory language involving the normal use of mental and physical faculties, we have held that expert evidence is not absolutely required to establish diminished use of physical and mental faculties. The rationale of that opinion is that abnormal behavior is observable, and that non-experts are competent to provide testimony relevant to whether a person acted abnormally. We believe the converse is also true, that normal behavior is observable, and that non-experts are competent to provide testimony relevant to whether a person acted normally. In summary, Hinson's testimony and other testimony that tended to show Hinson acted normally immediately prior to the fall constitutes some evidence that he possessed normal control over his physical and mental faculties at the time of the injury.

■ We also review the evidence contrary to Hinson's contention that he possessed normal control over his physical and mental faculties at the time of his injury. In reviewing the legal sufficiency of the evidence, because Hinson prevailed at trial, we are required to disregard Dr. Kurt's testimony that Hinson was intoxicated at the time of the accident, and the urinalysis test results "unless reasonable jurors could not." *City of Keller,* 168 S.W.3d at 808.

Dr. Kurt acknowledged that Hinson was not under any physical effect from his marijuana use at the time of the injury, and Dr. Kurt relied solely on the proposition that Hinson suffered a mental effect from his marijuana use at the time of his accident. Dr. Kurt further acknowledged that the effect on Hinson's mental status

due to marijuana at the time of the accident was subtle.

In evaluating Dr. Kurt's opinion, the jury could also consider evidence that undercut his ultimate opinion on Hinson's intoxication at the time of the injury. First, on cross-examination, Dr. Kurt acknowledged that he had no baseline on Mr. Hinson to establish what was "normal" for Hinson when Hinson had no marijuana in his body.

Second, Dr. Kurt did not define "normal" use of mental faculties. In absence of any scientific evidence conclusively establishing normal use, the jury was free to determine what would constitute normal use in Hinson's case.

Third, one of the foundations of Dr. Kurt's opinion, that the urinalysis had been collected "properly," appears contradicted by information on the test itself. Dr. Kurt testified that his first step in forming his opinion was to "look for the proper collection of a urine specimen, approximately within a few hours of the time of the accident[.]" The test report of Hinson's urine specimen states that it was collected on May 18, 2001, sixteen days after Hinson's May 2, 2001 injury. American Interstate offered no evidence to explain why the collection date on the urinalysis test that it offered into evidence showed that the urine was collected on May 18, and not within a few hours of the accident.

Fourth, Dr. Kurt's testimony does not address how a urinalysis taken at a point in time after the accident correlates to an earlier time when an injury occurred. Dr. Kurt's testimony in this case does not conclusively establish that Hinson was intoxicated due to his marijuana use at the time of the accident.

American Interstate argues that its evidence of Hinson's intoxication is conclu-

sive. It cites *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328 (Tex.1998), and *Novosad v. Mid–Century Ins. Co.*, 881 S.W.2d 546 (Tex.App.-San Antonio 1994, no writ) in support of its argument. In *Uniroyal*, the Texas Supreme Court states "The general rule is that opinion testimony, even when uncontroverted, does not bind the jury unless the subject matter is one for experts alone[.]" 977 S.W.2d at 338. In *Uniroyal*, the court held that the jury was not bound by expert testimony that a tire rim design was unreasonably dangerous. *Id.* at 339. Thus, *Uniroyal* is one of a multitude of cases under Texas law in which expert testimony regarding a subject was not binding on the jury.[3]

We also note that in *Uniroyal*, the Supreme Court cited *Coxson v. Atlanta Life Ins. Co.*, 142 Tex. 544, 179 S.W.2d 943 (1944) in support of the proposition that expert witness testimony is not generally binding. *Uniroyal*, 977 S.W.2d at 339. In *Coxson*, the issue was whether a life insurance policyholder who died due to tuberculosis was in good health when he obtained a life insurance policy. *Coxson*, 179 S.W.2d at 943. The policyholder's treating

physician testified that in his opinion the policyholder had suffered from tuberculosis for over two years before the policy issued. *Id.* at 944. The policyholder's beneficiary introduced no expert testimony, but produced witnesses who had known the policyholder during relevant time periods prior to the issuance of the policy, and who testified to facts and circumstances showing that during the time when the policy was issued the policyholder was in good health. *Id.* at 944–45. In *Coxson*, the Texas Supreme Court held that whether the policyholder was in good health when the policy issued was for the jury to determine, despite testimony to the contrary by the policyholder's treating physician. *Id.* at 945.

In *Novosad*, the San Antonio Court of Appeals cites the general rule that "[u]ncontroverted expert testimony may be regarded as conclusive if the nature of the subject matter requires the jury to be guided solely by the opinion of experts and the evidence is otherwise credible and free from contradictions and inconsistency." *Novosad*, 881 S.W.2d at 550. The court then affirmed a jury verdict rejecting an

---

**3.** *See, e.g., McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986)(explaining that fact finder who is evaluating expert testimony has considerable discretion and may reject expert testimony and accept lay testimony instead); *Broussard v. Moon*, 431 S.W.2d 534, 537 (Tex.1968)(explaining that witness's qualification as an expert does not preclude fact finder from exercising considerable discretion in determining degree of reliance to afford expert's opinion); *Coxson v. Atlanta Life Ins. Co.*, 142 Tex. 544, 179 S.W.2d 943, 945 (Tex.1944)(explaining that uncontroverted expert opinion testimony is not conclusive as it "is peculiarly within the province of the jury to weigh opinion evidence, taking into consideration the intelligence, learning, and experience of the witness and the degree of attention which he gave the matter" unless the testimony's subject matter about which, the fact finder, aided by its experience and knowledge would not be able to determine correct-

ly). We previously have followed these cases as have other of our sister courts. *See, e.g., O'Connor v. Miller*, 127 S.W.3d 249, 254 (Tex. App.-Waco 2003, pet. denied); *Selectouch Corp. v. Perfect Starch, Inc.*, 111 S.W.3d 830, 838 (Tex.App.-Dallas 2003, no pet.); *Walker v. Ricks*, 101 S.W.3d 740, 748 (Tex.App.-Corpus Christi 2003, no pet.); *Ponce v. Sandoval*, 68 S.W.3d 799, 806–07 (Tex.App.-Amarillo 2001, no pet.); *Akers v. Stevenson*, 54 S.W.3d 880, 884 (Tex.App.-Beaumont 2001, pet. denied); *Waltrip v. Bilbon Corp.*, 38 S.W.3d 873, 882 (Tex.App.-Beaumont 2001, pet. denied); *Olin Corp. v. Smith*, 990 S.W.2d 789, 797 (Tex. App.-Austin 1999, pet. denied)("Opinion testimony does not establish any material fact as a matter of law and is never binding on the trier of fact."); *Green v. Parrack*, 974 S.W.2d 200, 205 (Tex.App.-San Antonio 1998, no pet.); *Sipes v. General Motors Corp.*, 946 S.W.2d 143, 154 (Tex.App.-Texarkana 1997, writ denied).

award of future medical expenses for a future surgery because the evidence of whether claimant required future surgery due to injuries received in an accident conflicted with other expert opinion introduced at the trial. *Id.* at 551. Therefore, *Novosad* is yet another case in which a Texas court rejected the argument that a jury was bound by the expert testimony. In summary, American Interstate cites a general rule that uncontroverted expert testimony may be regarded as conclusive, but does not bring any cases to our attention that hold a jury is bound by expert evidence in a case where the issue is intoxication.

Although not cited by the parties, we have identified one circumstance where a scientific test conclusively establishes a disputed issue. In *Murdock v. Murdock,* 811 S.W.2d 557 (Tex.1991), a paternity case, the trial court found a putative father to be the father of a child despite evidence of a blood test excluding him as the biological father. 811 S.W.2d at 558. The Supreme Court reversed, and held that a paternity test establishing a zero probability of paternity is conclusive. *Id.* at 560. We note, however, that this case was decided under a Family Code provision that required trial courts to dismiss cases when blood tests showed that a putative father was not the biological father of the child. *Id.*[4] Thus, *Murdock* arose in the context of a statutory scheme making the blood test conclusive of the paternity issue, and is distinguishable from a case arising under the Labor Code where the Legislature has chosen not to make a drug test conclusive on intoxication.

In cases of alcohol intoxication, we note that scientific tests taken after the offending conduct are not treated as conclusive. For example, test results showing alcohol in a driver's system taken *after* the person has been driving are not legally conclusive that the driver was intoxicated *at the time* he drove the vehicle. In *Forte v. State,* 707 S.W.2d 89, 94–95 (Tex.Crim. App.1986), the Court stated:

> To be sure, if the State relies upon the 0.10% definition of intoxication, then such proof will normally appear in the form of a chemical test showing the alcohol concentration in a defendant's body *near the time of the offense.* However, a conviction will not necessarily follow from the offer of such a test. First, the trier of fact must still be convinced beyond a reasonable doubt that the chemical test provides trustworthy evidence of alcohol concentration in a defendant's breath, blood or urine. Second, the jury must still be convinced beyond a reasonable doubt that an inference can be made from the results of the chemical test that the defendant had a 0.10% alcohol concentration in his body *at the time of the offense.*

707 S.W.2d at 94–95 (emphasis in original).

The jury, as the finder of fact, is the sole judge of the credibility of the witnesses and the weight to give their testimony. *See Leyva v. Pacheco,* 163 Tex. 638, 641, 358 S.W.2d 547, 549 (Tex.1962). The jury is free to believe one witness and disbelieve another, and to resolve inconsistencies in the testimony. *See McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex. 1986).

Since we are required to indulge in every inference in favor of the jury's verdict, we conclude that a reasonable jury could

---

4. Former Family Code section 13.05, under which *Murdock* was decided, was repealed in 1995 as a part of the re-enactment of Family Code, Title 2. See Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 2, 1995 Gen. Laws 282. Currently, Family Code section 160.505 addresses paternal genetic testing. TEX. FAM. CODE ANN. § 160.505 (Vernon 2002).

have reasonably disregarded Dr. Kurt's testimony and the urinalysis test result in reaching its conclusion that Hinson was not intoxicated at the time of his injury. In summary, the scientific and expert evidence introduced during the trial in this case is not conclusive as a matter of law that Hinson was intoxicated at the time of the accident. Therefore, in reaching its decision that Hinson was not intoxicated at the time of the accident, the jury in this case could reasonably accept Hinson's evidence that he felt normal and that he was not mentally or physically impaired. The jury could also consider other circumstantial evidence showing his normal activity at work for half a day before the accident in a strenuous job without incident. American Interstate's point of error challenging the legal sufficiency of the evidence is overruled.

## FACTUAL SUFFICIENCY

American Interstate also argues that the evidence is factually insufficient to support the verdict. Because Hinson had the burden of proving he was not intoxicated, American Interstate must show that there is insufficient evidence supporting the jury's finding to overcome the jury verdict. *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 275–76 (Tex.App.-Amarillo 1988, writ denied). In addressing the factual insufficiency point, we must examine both the favorable and unfavorable evidence regarding the jury finding that Hinson was not intoxicated at the time of his injury, and must set aside the jury verdict only if the evidence supporting the verdict is so weak that it is clearly wrong and manifestly unjust. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex.1998); *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (per curiam).

Based on the evidence in this record, we are unable to conclude that the jury verdict is manifestly wrong or unjust. In Letner, lay observations of a driver's behavior supported a jury finding of intoxication. Implicitly, it must be true that persons capable of judging abnormal use of physical and mental faculties also have knowledge of what normal use of those same faculties would be. As a result, circumstantial evidence that a person behaved normally is some evidence that a person is not intoxicated.

American Interstate's evidence of intoxication consisted largely of opinion evidence by Dr. Kurt. The opinions placed into evidence from Dr. Kurt were largely conclusory, without a sufficient showing between the data relied upon and the opinion offered. The fact that Dr. Kurt's opinion was offered, without objection, adds nothing to its probative force. *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 713 (Tex.1997)(underlying data evaluated in determining if the opinion itself is reliable). Also, the ultimate issue in Hinson's case was whether he had the normal use of his mental and physical faculties, an area not delegated solely to expert opinion.

On this record, the jury could rationally disregard the testimony of American Interstate's expert. The scientific evidence might be more compelling under another record, and we do not intend to imply that expert evidence cannot in the appropriate case render lay testimony factually insufficient. On the other hand, when the record demonstrates why reasonable jurors could disregard evidence adverse to its answers to the issues, we may not substitute our judgment for that of the jury merely because we would have reached a different conclusion. We also overrule American Interstate's factual insufficiency argument.

Accordingly, we affirm the trial court's judgment in favor of William E. Hinson.

AFFIRMED.

DAVID GAULTNEY, Justice, dissenting.

I respectfully dissent. Because I believe the evidence is factually insufficient to support the jury verdict, I would reverse and remand the case for a new trial.

Some scientific and medical information requires expert explanation for jurors and judges to understand the evidence. *See, e.g., Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995)(frostbite causation); *Insurance Co. of N. Am. v. Myers*, 411 S.W.2d 710, 713–14 (Tex.1966)(cancer acceleration). Under the facts of this case, that is true with respect to the drug test, a key piece of evidence. A urine sample taken within an hour of the accident demonstrated plaintiff had an intoxicant in his system at the time of the accident. That fact was undisputed at trial and is not disputed on appeal. Whether that level necessarily means Hinson was intoxicated requires expert explanation. Hinson offered none.

The only expert testimony in the record for the jury and for this Court to consider is that the level of intoxicant demonstrated by the urine sample established Hinson's intoxication at the time of injury. The only evidence offered by Hinson was his own testimony. He testified he had not used the intoxicant within the last forty-eight hours; he did not feel anything but normal. Nevertheless, I believe under these circumstances, to meet his burden of proof, Hinson was required to offer controverting expert testimony to explain why the undisputed results of the urine sample did not establish intoxication.

I do not believe the various reasons suggested by the majority are sufficient to explain away Dr. Kurt's testimony about the drug test results. Based on the urine sample test results and reasonable medical probability, Dr. Kurt testified Hinson was intoxicated, as that term is defined by the Labor Code, at the time of the injury. TEX. LAB.CODE ANN. § 401.013 (Vernon Supp.2005). As the majority notes, there were no objections to Dr. Kurt's testimony that Hinson was intoxicated at the time of the accident. Dr. Kurt explained he looks "for the proper collection of a urine specimen, approximately within a few hours of the time of the accident[.]" Hinson says in his brief to this Court that urine samples were taken for drug screening purposes within an hour of the accident, and he did not argue at trial and does not say on appeal that a urine sample was collected untimely.

The majority relies on a date neither party mentioned at trial or on appeal. Given Dr. Kurt's expert testimony that he checks for timely collection of a urine sample and the lack of any challenge to that assertion, the date on the report is likely of no actual significance to the intoxication issue. Rather, the date likely refers to the date the sample was submitted for testing. The safety director of Hinson's employer explained what happened as follows:

Q. [Defense Counsel] Okay. Now, what—how did—how did it come that a urine sample was taken from Hinson after this accident? Did you direct that?

A. I directed by telephone to the hospital to take a post-accident drug screen sample.

Q. All right. And then subsequent to that time were you advised by the hospital that there was a presumptive positive on the test?

A. Yes. It wasn't that particular day, but there was—time has elapsed, yes.

Q. Then in accordance with normal policy, because it was presumptive positive, did you request a quantitative analysis?

A. I did.

Q. And that was conducted; and that is the report of that quantitative analysis that you have there, is it not, sir?

A. Yes, sir. That is.

Even if the jury rested its verdict on the date reflected on the report, that evidence is too weak to support the verdict given the undisputed contrary evidence concerning the date the sample was collected.

Hinson's own testimony was some evidence he was not intoxicated, although too weak to support the verdict considering the contrary evidence in the record. Hinson admits he had a certain level of intoxicant in his system at the time of the accident. He presented no evidence to explain the drug test. In my view, under the circumstances he did not meet his burden of proof. The case should be remanded for a new trial.