*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*



★ ★ ★ ★ ★ ★

# MEMORANDUM OPINION

No. 04-07-00750-CV

Michael **ADKINS**,
Appellant

v.

**TEXAS MUTUAL INSURANCE COMPANY**,
Appellee

From the 57th Judicial District Court, Bexar County, Texas
Trial Court No. 2005-CI-19774
Honorable Michael Peden, Judge Presiding[1]

Opinion by:    Karen Angelini, Justice

Sitting:       Catherine Stone, Justice
               Karen Angelini, Justice
               Steven C. Hilbig, Justice

Delivered and Filed:   October 8, 2008

AFFIRMED

This appeal arises out of a worker's compensation case. Michael Adkins, an employee of

R & L Foods, was injured at work. Adkins filed a worker's compensation claim and prevailed at the

administrative level. R & L's insurance carrier, Texas Mutual Insurance Company, filed suit in

district court, contending Adkins's claim was not compensable because he was intoxicated at the

---

[1] The Honorable Michael Peden signed the final judgment. The Honorable Joe Frazier Brown, Jr., presided over the trial.

time he sustained his injuries. The jury agreed, finding Adkins was intoxicated. Judgment was entered in favor of Texas Mutual, and Adkins appeals. In one issue, Adkins contends the trial court erred in denying his motion to exclude Texas Mutual's expert testimony and in admitting the expert's testimony. We affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Adkins was a restaurant general manager, employed by R & L Foods. On the day of the accident, which was a Friday, he reported for work shortly before 8:00 a.m. At about 4:00 to 4:30 p.m., he was retrieving a bag of potato wedges from a walk-in freezer when he slipped and fell on some ice. The factual issue before the jury was whether he was intoxicated when he slipped and fell.

At trial, Adkins admitted that on the Tuesday before the accident he had smoked marijuana while watching a Spurs basketball game with friends. According to Adkins, he and his friends had shared three to five marijuana cigarettes between three people. Adkins testified that smoking marijuana relaxes him. However, he denied being under the physical effects of marijuana on the day of the accident. And, in response to questioning, he refused to identify the friends with whom he smoked marijuana on the Tuesday before the accident.

In addition to Adkins, two other R & L employees testified about events occurring on the day of the accident. David Gonzalez, an assistant manager, was present in the store on the day Adkins was injured. Gonzalez testified that if Adkins did not have the normal use of his physical or mental faculties, then he would not have allowed him to continue working. Sam Hernandez, a restaurant general manager, also testified. According to Hernandez, he was called to the restaurant to pick Adkins up and take him to the hospital. On the way to the hospital, they stopped at the bank to make a deposit. Hernandez testified that, not being an expert, he could not say whether a person

was intoxicated. And, based on his observation of Adkins, Hernandez testified that he had no opinion about whether Adkins was intoxicated.

Before any testimony was offered at trial, Adkins moved to exclude the testimony of Texas Mutual's expert witness, Dr. Jim Kelaher. Prior to making a ruling, the trial court heard testimony from Dr. Kelaher. Dr. Kelaher testified that, in preparation for this case, he had reviewed the drug test report and the accident report, which included medical notes. He also considered peer-reviewed journal and book articles involving marijuana testing and intoxication.

Dr. Kelaher's opinion in this case focused primarily on an interpretation of the drug test results. According to the urine drug test performed on Adkins four hours after his accident, Adkins had a marijuana metabolite level of 1,783 nanograms per milliliter. In Dr. Kelaher's opinion, this level is definitely on the high side. He explained that the cutoff for a positive test result is 50 nanograms per milliliter in initial testing and 15 nanograms per milliliter in confirmatory testing. Marijuana, according to Dr. Kelaher, has many well-known effects. It can affect cognition, mood, perception, pupillary response, blood pressure, executive functioning, and memory. According to Dr. Kelaher, the significance of a 1,783 level is that levels that high are not typically seen. Given that Adkins tested at that level four hours after the accident, Dr. Kelaher opined that Adkins's mental or physical faculties were altered at the time of the accident. In Dr. Kelaher's opinion, there was no doubt that Adkins was intoxicated at the time of the accident, meaning Adkins had some alteration in his physical and/or mental functioning. Dr. Kelaher found it implausible that the marijuana use Adkins admitted to a few days before the accident could account for the high level indicated in his urine.

Dr. Kelaher also testified that studies show that when trained individuals try to determine by observation whether a person is intoxicated, there is an error rate of twenty to thirty percent. A drug test, on the other hand, is much more objective. According to Dr. Kelaher, it is the use of marijuana, and not the level in the body, that establishes intoxication. People are altered and affected at very low levels, and a person with a level as high as 1,700 is far beyond anything typically seen. However, on cross-examination, Dr. Kelaher admitted that he wrote a book in which he stated that a drug test alone does not tell how impaired a person is. Following this testimony outside the presence of the jury, the trial court ruled that Dr. Kelaher's opinions were sufficiently reliable to allow his testimony before the jury.

At trial, Dr. Kelaher's testimony was similar to the testimony he gave at the hearing outside the jury's presence. He testified that, based on the medical literature he has reviewed, a level of 1,783 nanograms per milliliter would affect a person's normal mental or physical faculties. In this case, in Dr. Kelaher's opinion, with a level of 1,783 nanograms per milliliter, Adkins could not have had the normal use of his faculties. Dr. Kelaher stated that although he wrote in his book that a drug test does not indicate how impaired a person is, in his opinion, the use of marijuana alone in Adkins's case does equate to intoxication.

### INTOXICATION DEFENSE

The worker's compensation laws prohibit the recovery of compensation where, at the time of injury, an employee is intoxicated. TEX. LAB. CODE ANN. § 406.032(1)(A) (Vernon 2006). Thus, an employer may defend a worker's compensation claim on the ground that the injury was caused while the employee was in a state of intoxication. TEX. LAB. CODE ANN. § 406.033(c)(2) (Vernon 2006); *see Sanchez v. State Office of Risk Mgmt.*, 234 S.W.3d 96, 99 (Tex. App.—El Paso 2007, no

pet.). "Intoxication" means the state of (1) having an alcohol concentration to qualify as intoxicated under section 49.01(2) of the Texas Penal Code; or (2) not having the normal use of mental or physical faculties resulting from the voluntary introduction into the body of an alcoholic beverage or a controlled substance as defined by section 481.002 of the Texas Health and Safety Code. TEX. LAB. CODE ANN. § 401.013(a) (Vernon 2006). Marijuana is a controlled substance under section 481.002. TEX. HEALTH & SAFETY CODE ANN. § 481.002 (Vernon 2006). Thus, where the use of marijuana is involved, intoxication is defined as not having the normal use of mental or physical faculties resulting from the voluntary introduction into the body of marijuana.

"In cases involving controlled substances, there is no level or test defined by the statute that establishes per se if a person has lost use of his or her physical and mental faculties." *Tex. Mut. Ins. Co. v. Havard*, No. 01-07-00268-CV, 2008 WL 598347, at *3 (Tex. App.—Houston [1st Dist.] Mar. 6, 2008, no pet. h.) (citing *Am. Interstate Ins. Co. v. Hinson*, 172 S.W.3d 108, 115 (Tex. App.—Beaumont 2005, pet. denied)). Thus, the statutory standard for controlled substances, as compared to alcohol, is relatively subjective. *See id.*

The party appealing the Texas Workers' Compensation Commission's ruling bears the burden of proof by a preponderance of the evidence. TEX. LAB. CODE ANN. § 410.303 (Vernon 2006). The Texas Labor Code provides that "[o]n the voluntary introduction into the body of any substance listed under Subsection (a)(2)(B), based on a blood test or urinalysis, it is a rebuttable presumption that a person is intoxicated and does not have the normal use of mental or physical faculties." *Id.* § 401.013(c). This rebuttable presumption provision was enacted in 2005, after the claim involved herein; however, the amendment was a codification of former case law. *See Havard*, 2008 WL 598347, at *3 (citing TWCC App. No. 021751, 2002 WL 31115380 (2002); TWCC App.

No. 032618, 2003 WL 23011731 (2003); and TWCC App. No. 012208, 2001 WL 1472150 (2001)).

Thus, in this case, Texas Mutual, as the party appealing from the TWCC ruling, had the burden of proving, by a preponderance of the evidence, that Adkins was intoxicated at the time of his injury. Further, based upon a positive test for marijuana through urinalysis, Texas Mutual raised a rebuttable presumption that Adkins was intoxicated at the time he was injured.

### EXPERT TESTIMONY

To determine whether the trial court properly admitted expert testimony, we apply an abuse of discretion standard of review. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 687 (Tex. 2002). Simply because a trial court may decide, in its discretion, to admit testimony in a different manner than would an appellate court does not amount to an abuse of discretion. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

Expert testimony must be relevant and based on a reliable foundation. *Helena Chem. Co.*, 47 S.W.3d at 499. It is the trial court's threshold duty to ensure an expert's testimony rests on a reliable foundation and is relevant to the issues in the case. *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 728 (Tex. 1998). The trial court is responsible for ensuring not that the expert's conclusions are correct, but rather that the analysis used to reach those conclusions is reliable. *See id.*

The supreme court has set forth two tests to assist trial courts in determining the reliability of expert testimony: the *Robinson* factor analysis and the *Gammill* analytical gap test. *See Allstate Tex. Lloyds v. Mason*, 123 S.W.3d 690, 697-98 (Tex. App.—Fort Worth 2003, no pet). Under

*Robinson*, the trial court may consider the following non-exhaustive list of factors: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995). Under *Gammill*, the trial court must determine whether "there is simply too great an analytical gap between the data and the opinion proffered." *Gammill*, 972 S.W.2d at 727 (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

## DISCUSSION

In arguing that Dr. Kelaher's testimony was unreliable, Adkins criticizes Dr. Kelaher in three basic respects: (1) Dr. Kelaher did not review statements from or speak with Adkins's fellow employees to try to ascertain what they observed about Adkins on the day of the accident; (2) Dr. Kelaher's opinion that "in this case" the presence of marijuana in Adkins's system amounts to intoxication is at odds with Dr. Kelaher's book in which he states that a drug test does not tell how impaired an individual is; and (3) the prejudicial effect upon the jury of the high level of marijuana metabolite in Adkins's system clearly outweighs any probative value.

### A.    *Employee Statements*

Adkins claims Dr. Kelaher should have talked to witnesses or reviewed their statements about their observations of Adkins on the day of the accident. It is not entirely clear, however, that Dr. Kelaher failed to review such statements. Dr. Kelaher testified at the pre-trial hearing that he thought he had reviewed witness statements in some handwritten notes. And, he believed they were

co-worker statements. Furthermore, the depositions from the co-employees, David Gonzalez and Sam Hernandez, gave little indication as to whether Adkins appeared to them to be impaired. And, Adkins has offered no authority that would require an expert such as Dr. Kelaher to review witness statements or interview witnesses before rendering his opinion. In fact, Dr. Kelaher made it clear he was focusing on the results of the drug testing. According to Dr. Kelaher, studies show that when people such as police officers who are trained to identify signs of impairment are asked to give an opinion as to impairment, there is an error rate of twenty to thirty percent. Thus, in Dr. Kelaher's opinion, a drug test is much more objective than personal observation. We cannot conclude that Dr. Kelaher's failure to interview witnesses or review their statements rendered his opinion unreliable.

**B.      Dr. Kelaher's Book**

Adkins points to Dr. Kelaher's testimony wherein he states that "in this case," because drugs were in Adkins's system, he was intoxicated. Adkins then points to the following statement printed in a book written by Dr. Kelaher: "Drug tests tell us which drugs are present, not how impaired a person is." Adkins argues that Dr. Kelaher's opinion is flawed because it is at odds with this statement in his book. A closer review of Dr. Kelaher's testimony reveals his testimony is not inconsistent with his book.

Dr. Kelaher testified to the following:

Q.      Because it's in his system, he's therefore intoxicated, right?

A.      It's not always that simple, but in –

Q.      Isn't it?

A.      Not always.

Q.      Isn't that what you said in this case?

A.     In this one, yes.

Q.     Isn't that what you said?

A.     Yes.

Thus, Dr. Kelaher was clarifying that, although he stated in his book that a drug test does not tell how impaired a person is, nevertheless, "in this case," the drug test is a sign of impairment. It is apparent from the whole of his testimony that Dr. Kelaher's opinion of impairment "in this case" is based on the extreme level of marijuana found in Adkins's urine. Throughout his testimony, both pre-trial and during trial, Dr. Kelaher referred to the extremely high level of marijuana present in Adkins's system. Although a finding of above a thousand is rarely seen, Adkins tested at 1,783 nanograms per milliliter. Based on the medical literature, at that level, according to Dr. Kelaher, a person's normal faculties would be affected.

Dr. Kelaher further clarified that when he wrote his book, he was addressing multiple standards that apply to the workplace, not just those that apply in the workers' compensation context. Thus, there is not such an inconsistency between Dr. Kelaher's opinion at trial and the statement he wrote in his book that would render his opinion unreliable.

## C.     Prejudicial Effect

Adkins further urges that the prejudicial effect of Dr. Kelaher's testimony regarding the high level of marijuana metabolite in Adkins's system outweighs any probative value of such evidence. *See* TEX. R. EVID. 403. An analysis under Rule 403 includes, but is not limited to, the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational yet indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005).

Adkins agrees that the test results were probative of the fact that he had marijuana in his system at the time of his injury. He argues, however, that the evidence of the high level of marijuana metabolite in his system clearly outweighs any probative value and that because he admitted to having smoked marijuana three days before the injury the evidence was cumulative. We do not agree.

Although the evidence was certainly prejudicial to Adkins, it was not *unfairly* prejudicial because the results of the test relate directly to Texas Mutual's defense. *See Mechler*, 153 S.W.3d at 440-41 (holding intoxilyzer results not unfairly prejudicial because they relate directly to the charged offense of DWI). Further, it did not take an unreasonable amount of time to develop the evidence pertaining to the high level of marijuana metabolites in Adkins's system. And, although Adkins did admit to having smoked marijuana three days before his injury, the high level to which Dr. Kelaher testified was necessary to demonstrate the implausibility of Adkins's testimony that the positive test was a result of him having smoked marijuana three days earlier. Thus, the trial court did not abuse its discretion in admitting Dr. Kelaher's testimony regarding the high level of marijuana metabolites in Adkins's system on the day of his injury.

## CONCLUSION

For the above-stated reasons, we find no abuse of discretion in the trial court's ruling that Dr. Kelaher's expert testimony was reliable and, therefore, admissible. We affirm the trial court's judgment.

Karen Angelini, Justice