NUMBER 13-09-186-CV


COURT OF APPEALS


THIRTEENTH DISTRICT OF TEXAS


CORPUS CHRISTI - EDINBURG

 

 

DOMINION OKLAHOMA TEXAS EXPLORATION

AND PRODUCTION, INC., Appellant,

 

v. 


FAULCONER ENERGY CORPORATION, ET AL., Appellees.

 


On appeal from the 389th District Court 

of Hidalgo County, Texas.

 


MEMORANDUM OPINION


Before Chief Justice Valdez and Justices Benavides and Vela

Memorandum Opinion by Justice Vela


 This is an appeal from a trial court judgment awarding appellees, Faulconer
Energy Joint Venture 1988 ("FEJV88"), Faulconer Energy Corporation ("FEC") and
Vernon E. Faulconer, Inc. ("VFI") (collectively, appellees will be referred to as,
"Faulconer," unless the specific argument or issue requires us to further delineate the
specific party), $2,167,342.33 from appellant, Dominion Oklahoma Texas Exploration
and Production, Inc. ("Dominion"). By three issues, Dominion argues that: (1) the trial
court erred in awarding Faulconer amounts that were paid by Bituminous Insurance
Company, Faulconer's insurer, because Bituminous was not a party in the underlying
case; (2) the trial court erred in holding that Dominion agreed to indemnify Faulconer
from the consequences of its own negligence because the indemnity provisions at issue
fail to satisfy the fair notice requirements under Texas law; and (3) the trial court erred in
holding that there was no agreement between Faulconer and Dominion to settle the
Ayala litigation because the parties came to an agreement on all of the essential terms
of the joint settlement. By one cross-issue, Faulconer urges that the trial court erred in
miscalculating the amount of prejudgment interest because the trial court used the filing
of this lawsuit as the accrual date, rather than a notice of claim that was filed in a
previous case that had been settled. We affirm.

I. Background 

 This suit arises from an assignment of mineral interests and related indemnity
agreements. Dominion alleged that Faulconer breached an agreement related to
settlement of litigation brought by third parties (referred to in the opinion as the "Ayala
litigation") that related to the interest assigned. (1) Dominion is engaged in the business of
exploring and producing oil, gas and other minerals. It is the successor in interest to
Louis Dreyfus Natural Gas Corporation and American Exploration Company
("American"). Faulconer is also engaged in the same business. 

 In transactions occurring between 1987 and 1989, Faulconer bought from Fina
and another company called Fair Operating Company, a system of five gas well and
gathering lines and connecting pipes. In September 1993, FEJV88 (the Faulconer joint
venture) and American entered into a purchase and sale agreement and an assignment
and bill of sale to sell what had previously been acquired from Fina and Fair. (2) There
were indemnity agreements that were part of both documents, and the enforceability of
those agreements is at issue in this appeal. 

 Two years after the sale to Dominion, various lawsuits, including the Ayala
litigation, were filed by plaintiffs claiming damages pertaining to leaking pipelines. In
1998, Faulconer filed suit against Dominion asking for indemnity and a defense in the
litigation. Faulconer urged that indemnity and a defense were owed based upon the
1993 purchase and sale agreement and the assignment and bill of sale. In 1999, the
lawsuit between Faulconer and American (Dominion's predecessor) settled. American
reserved the right to deny indemnity and agreed to provide a defense to all of the
Faulconer entities. (3) 

 In 2000, a case similar to the Ayala case went to trial in Hidalgo County that
resulted in a $100 million verdict for the plaintiffs in that case against another oil
company. In October 2002, Fina sued Faulconer for in excess of the $1.8 million it had
incurred in defending and settling in the Ayala litigation. Tom Markel, a vice president
for Faulconer, testified that this was a significant lawsuit to Faulconer. Prior to
November 2005, counsel for Faulconer became concerned and wrote a letter to Larkin
Eakin, counsel for Dominion, urging that Dominion should contribute to the settlement of
the Ayala litigation because the venue was bad and a large judgment could be predicted
if the Ayala case went to trial. 

 In November 2005, Dominion and Faulconer had a meeting regarding a possible
joint settlement of the Ayala litigation. The evidence at trial was conflicting with respect
to whether Faulconer's concern about including Fina in any proposed settlement was
discussed. Several witnesses testified on behalf of Dominion suggesting that Faulconer
had never mentioned that it needed to be indemnified against any claim by Fina before
agreeing to settle. Conversely, witnesses for Faulconer testified that it was not willing to
settle the Ayala litigation if Fina was not included and that Dominion knew that it was
important to Faulconer. The parties unsuccessfully mediated the Ayala litigation in
December 2005. The parties also learned in December that there would be no release
from Fina. 

 In January 2006, Joe Luce, an attorney, began negotiating with the Ayala
plaintiffs on behalf of Dominion. In late January 2006, Luce determined that he could
settle the Ayala litigation for $12 million. Before the settlement occurred, emails were
exchanged between Luce and counsel for Faulconer. In one email, sent on January 12,
2006, counsel for Faulconer outlined the amount and percentages of the settlement that
Faulconer would agree to pay toward settling the Ayala litigation. Again, Dominion and
Faulconer dispute whether the claims of Fina were included at this time. Because
Faulconer would not agree to settle without a release from Fina, Dominion settled with
the Ayala plaintiffs without Faulconer's participation. At that time, Dominion also
stopped funding Faulconer's defense. Thereafter, the plaintiffs settled with Fina, and
Faulconer settled with the Ayalas for $1.5 million. 

 On May 19, 2006, Dominion sued Faulconer seeking declaratory relief that it had
no duty to provide a defense to Faulconer after March 2, 2006, or to indemnify
Faulconer for any judgment in the Ayala lawsuit. Dominion also sought damages
against Faulconer, alleging that they had beached the agreement to settle the Ayala
lawsuit. Faulconer counterclaimed, alleging that Dominion breached its obligation to
indemnify Faulconer from the costs of defending and settling the Ayala litigation. 

 Trial was to the court. Judgment was entered on January 13, 2009, in favor of
Faulconer awarding the sum of $2,167,342.33, which consisted of litigation costs in the
amount of $661,601.41 in connection with the filing of the Ayala litigation, and litigation
costs of $5,740.92 in connection with defending the Fina case. (4) The trial court also
awarded Faulconer $1.5 million, representing the cost of settling the Ayala litigation and
prejudgment interest on the total amount of the judgment at five percent per annum
from May 19, 2006, until the date of judgment. This appeal ensued. 

II. Standard of Review

 In an appeal from a bench trial, the trial court's findings of fact "have the same
force and dignity as the jury's verdict upon questions." Anderson v. City of Seven
Points, 806 S.W.2d 791, 794 (Tex. 1991); see Ashcraft v. Lookadoo, 952 S.W.2d 907,
910 (Tex. App.-Dallas 1997, writ denied) (en banc). The trial court's findings of fact are
reviewed for legal and factual sufficiency of the evidence to support them by the same
standards that are applied in reviewing evidence supporting a jury's answers. Ortiz v.
Jones, 917 S.W.2d 770, 772 (Tex. 1996); Anderson, 806 S.W.2d at 794. Fact findings,
however, are not conclusive when, as in this case, a complete reporter's record appears
in the record. City of Corpus Christi v. Taylor, 126 S.W.3d 712, 717 (Tex. App.-Corpus
Christi 2004, pet. dism'd) (citing Tucker v. Tucker, 908 S.W.2d 530, 532 (Tex. App.-San
Antonio 1995, writ denied)); see Middleton v. Kawasaki Steel Corp., 687 S.W.2d 42, 44
(Tex. App.-Houston [14th Dist.] 1985, writ ref'd n.r.e.). Unchallenged findings of fact
are binding on an appellate court unless the contrary is established as a "matter of law"
or there is "no evidence" to support the finding. McGalliard v. Kuhlmann, 722 S.W.2d
694, 696 (Tex. 1986). Generally, attacks on the sufficiency of the evidence supporting
findings of fact "must be directed at specific findings of fact, rather than at the judgment
as a whole." Arrellano v. State Farm Fire & Cas. Co., 191 S.W.3d 852, 855 (Tex.
App.-Houston [14th Dist.] 2006, no pet.) (citing Zagorski v. Zagorski, 116 S.W.3d 309,
319 (Tex. App.-Houston [14th Dist.] 2003, pet. denied)). 

 A finding is legally sufficient if it "would enable reasonable and fair-minded people
to reach the verdict under review." City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex.
2005). A legal sufficiency challenge may only be sustained when: (1) the record
discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove a vital
fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4)
the evidence establishes conclusively the opposite of a vital fact. Uniroyal Goodrich
Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998). In evaluating the evidence's
legal sufficiency, "we credit evidence that supports the verdict if reasonable jurors could,
and disregard contrary evidence unless reasonable jurors could not." Kroger Tex. Ltd.
P'ship v. Suberu, 216 S.W.3d 788, 793 (Tex. 2006) (citing City of Keller, 168 S.W.3d at
827); see Am. Interstate Ins. Co. v. Hinson, 172 S.W.3d 108, 114 (Tex. App.-Beaumont
2005, pet. denied). The trial court, as fact-finder, determines the credibility of the
witnesses and the weight to be given their testimony. See City of Keller, 168 S.W.3d at
819; McGalliard, 722 S.W.2d at 697. Furthermore, in reviewing the sufficiency of the
evidence, we may not substitute our own judgment for that of the trier of fact, even if we
would reach a different conclusion on the evidence. Mar. Overseas Corp. v. Ellis, 971
S.W.2d 402, 407 (Tex. 1998).

 In conducting a factual sufficiency review, we consider and weigh all of the
evidence and set aside the verdict and remand the cause for a new trial, if we conclude
that the verdict is so against the great weight and preponderance of the evidence as to
be manifestly unjust, regardless of whether the record contains some "evidence of
probative force" in support of the verdict. Golden Eagle Archery, Inc. v. Jackson, 116
S.W.3d 757, 761-62 (Tex. 2003). The evidence supporting the verdict is to be weighed
along with the other evidence in the case, including that which is contrary to the verdict. 
Id.

 A party may not challenge conclusions of law for factual sufficiency, but we may
review conclusions of law to determine their correctness based upon the facts. Citizens
Nat'l Bank v. City of Rhome, 201 S.W.3d 254, 256 (Tex. App.-Fort Worth 2006, no
pet.). We will uphold a conclusion of law if the judgment can be supported on any legal
theory supported by the evidence. Tex. Dep't of Pub. Safety v. Stockton, 53 S.W.3d
421, 423 (Tex. App.-San Antonio 2001, pet. denied). We review conclusions of law de
novo, see State v. Heal, 917 S.W.2d 6, 9 (Tex. 1996), and we will not reverse them
unless they are erroneous as a matter of law. Stockton, 53 S.W.3d at 423. 

III. Subrogation Issue

A. Background

 By its first issue, Dominion urges that the trial court erred in awarding Faulconer
damages that were paid by Bituminous, its insured, and were not incurred by Faulconer. 
The trial court found that Faulconer incurred costs of $1,500,000 to settle the Ayala
litigation. The trial court also filed additional findings of fact that Bituminous paid
$389,239.89 of the $661,601.41 of the costs of defending Faulconer in the underlying
lawsuit and it paid $500,000 of the $1,500,000 of the costs of settling the claims against
Faulconer in the underlying suit. Dominion argues that the only way Faulconer would
be entitled to recover that amount would be if Bituminous had assigned its subrogation
rights to Faulconer. Conversely, Faulconer argues that an insured may bring a
subrogated claim of the insurer in its own name, and the insurer is not required to be a
party to the suit.

B. Analysis

 Dominion argues that the case must be reversed because Bituminous was a
necessary party to this litigation. It relies on Thoreson v. Thompson as authority for its
position that Bituminous was a necessary party. 431 S.W.2d 341, 347 (Tex. 1968). In
Thompson, the supreme court held that the trial court improperly overruled a plea in
abatement because the plaintiff's insurer had not been joined. Thompson, the
defendant, filed a plea in abatement for failure to join the insurance company as a party. 
Id. at 346. The Thompson court reasoned that the insurer was a necessary party and
became a pro tanto owner of the cause of action. Id. at 347. Nothing in the record in
Thompson showed the insurance company had notice of the suit nor did the judgment
provide for any recovery by the insurance company. Id. 

 Here, no party filed a plea in abatement to join Bituminous. And, there is no
complaint or pleading filed by Dominion urging that Bituminous was a necessary party
and was required to be joined. Also, it is clear in this record, unlike in Thompson, that
Bituminous understood that its interests were being managed in the lawsuit. In
December 2007, Faulconer filed a document in the trial court titled "Statement
Regarding Bituminous Insurance Companies." Attached was a letter from counsel for
Bituminous to counsel for Faulconer, stating that the "interests of Bituminous Insurance
Companies are being protected in the pending litigation referenced above by the
Faulconer entities. . . . Thus, Bituminous is not going to file a separate action against
Dominion Oklahoma Texas Exploration & Production, Inc. to recover attorney's fees or
indemnity benefits paid under its insurance contract with Faulconer entities." The
record also reflects that Dominion had previously received a copy of the $500,000
settlement check issued by Bituminous and payable to counsel for the Ayala plaintiffs. 
Thus, unlike the Thompson case, all parties were aware that Bituminous was the insurer
and of Bituminous's position that it was protected by the lawsuit. Dominion was aware
in advance of the trial in this case that Bituminous had paid a portion of the funds to
settle the Ayala claims. 

 Here, it appears that both Bituminous and its insured, Faulconer, believed that its
interest was being protected by Faulconer and that Bituminous had notice that the suit
was proceeding in its absence. Therefore, Thompson is factually distinguishable.

 Dominion also relies on Trans-State Pavers, Inc. v. Haynes, for the proposition
that an insured cannot assert the subrogation rights of its insurer without placing the
opposing party on notice of the subrogation claims and making the insurance company
a party. 808 S.W.2d 727, 736 (Tex. App.-Beaumont 1991, writ denied). In Haynes, the
trial court allowed the insureds, who were the plaintiffs, to file a post-judgment trial
amendment adding the insurer as a party plaintiff. Id. at 729. The defendants objected,
contending that at no time did it receive notice before judgment that the court had
granted leave to file the trial amendments. Id. The court pointed out that appellant in
that case was facing a judgment in favor of a party who was added to the case after
verdict and judgment and had never been served with citation. Id. at 734. Here, there
is no similar argument. The crux of Dominion's argument is that Faulconer will receive
a double recovery in this case because part of its damages have already been paid by
Bituminous. There is no argument or suggestion, however, that Bituminous will look to
Dominion for any sort of redress. In fact, it appears to be the opposite. Haynes is also
distinguishable because there was no showing in that case that the insurer knew about
the suit. Here, there was evidence that Bituminous knew about the lawsuit.

 Dominion further argues that we should not consider Faulconer's notice
regarding the Bituminous entities because it was not formally introduced at trial. We
note that it was filed in the trial court during trial and is included as part of the clerk's
record in this Court. The letter was also presented to the trial court during the course of
the trial. Regardless, the trial court may take judicial notice of its own file documents
even though no request is made to do so and no formal announcement is made. Alford
v. Johnston, 224 S.W.3d 291, 300 (Tex. App.-El Paso 2005, pet. denied). The trial
court did not err in considering the letter. 

 In analyzing the issue before us, we look to the possible prejudice that could
result from this case proceeding to trial in the posture that it did. See Fort Worth &
Denver Ry. Co. v. Ferguson, 261 S.W.2d 874, 879 (Tex. App.-Fort Worth 1953, writ
dism'd). Here, Dominion had notice well in advance of the trial that Bituminous had paid
a portion of the settlement. In a situation where a party is on actual notice that a third
party owns all or a portion of a cause of action, a defendant is under a duty to either
protect the interest of the third party in the manner the case is pleaded or the defendant
"is under the duty to protect himself from such party by properly raising the issue as to
plaintiff's right to sue in the capacity in which he does sue . . . ." Id. at 879. "If he does
neither, then he could not complain of any exposure to further litigation from the third
party subrogee-assignee. " Id. There was proof before the trial court that Bituminous
will not file a claim against Dominion, as well as proof that Bituminous's interests were
protected by the lawsuit. 

 To reverse this case in the face of Bituminous's agreement that it is protected by
Faulconer's participation in this lawsuit would not make sense. Even Dominion's prayer
for relief with respect to this issue is nebulous with regard to how this Court would
proceed if it determined that reversal was the correct disposition of this issue. Dominion
prays that we "reverse the trial court's judgment awarding Faulconer over $2.1 million,
over $839,000 of that amount belonged to Bituminous, not Faulconer." But, Dominion
does not suggest whether rendition, remittitur of the amount paid by Bituminous, or
remand to require the joinder of Bituminous would be proper. Under the record here,
both Dominion and Bituminous are protected. And, because of the specific facts
presented, the appearance of Bituminous as a party was not necessary. We overrule
issue one.

IV. Indemnification Claim

A. Background Facts

 Dominion contends by its second issue that the trial court erred in finding that
Dominion agreed to indemnify Faulconer from the consequences of its own negligence
because the indemnity provision at issue fails to satisfy the fair notice requirements
under Texas law. Faulconer claims that Dominion's indemnity obligation extended to
damages caused by Faulconer's negligence. Faulconer also argues that the express
negligence rule, and the fair notice doctrine do not apply to this case. In other words,
Faulconer claims that actual knowledge of the indemnity provision eliminated any need
for "conspicuous" language. 

 The indemnity provisions at issue were included in a purchase and sale
agreement and assignment and bill of sale entered into by Faulconer and American. (5)
 In
1993, Faulconer entered into an agreement with American under which Faulconer
conveyed property to American. The agreement included a purchase and sale
agreement and an assignment and bill of sale that was included as an attachment to the
purchase and sale agreement and was also a separately executed contract. Both
documents contain indemnity agreements--it is the sufficiency of those agreements that
is at issue here. 

 The purchase and sale agreement provides, in pertinent part:

7. Assumption and Indemnity. At the closing date, Buyer agrees to
assume and will pay, perform and discharge all obligations of Seller to the
extent such obligations are attributable to Seller's interests in the property
and are attributable to periods from and after the Effective Date. Buyer
assumes the obligations set forth in the Assignment and Bill of Sale as
attached hereto as exhibit "B", . . . and Buyer agrees to indemnify, defend
and hold Seller, its successors and assigns, and their respective affiliates,
directors, officers, employees, stockholders, partners and agents harmless
from and against any and all loss, liability, liens, demands, judgments,
suits and claims of any kind or character resulting from such assumed
obligations or relating thereto. Buyer agrees to defend any suits brought
against Seller on account for any such claims and to pay any judgment
against Seller resulting from any such suits, along with all costs and
expenses relative to such claims, including attorney's fees. 


Except as assumed by Buyer in the foregoing paragraph and in the
Assignment and Bill of Sale attached hereto as exhibit "B", Seller shall
indemnify and hold harmless buyer, its successors and assigns, and their
respective affiliates, directors, officers, employees, stockholders, partners
and agents, from and against any and all loss, liability, liens, demands,
judgments, suits and claims of any kind or character arising out of, in
connection with, or resulting from Seller's operation of the Property, for
periods prior to the Effective Date. Seller agreed to defend any suits
brought against Buyer on account of any such claims and to pay any
judgments against Buyer resulting from any such suits, along with all costs
and expenses relative to such claims, including attorney's fees.

 The assignment and bill of sale provided, with respect to indemnity:

(b) Assignee shall defend, indemnify and hold Assignor harmless from any
and all claims in favor of any person, business or governmental entity for
personal injury, death or damage to property or to the environment, or for
any other relief arising directly or indirectly from, or incident to, the use,
occupation, operation, maintenance or abandonment of any of the
Interests, or condition of the property or premises, whether latent or
patent, and (INCLUDING WITHOUT LIMITATION THOSE ARISING
FROM OR CONTRIBUTED TO BY THE NEGLIGENCE IN ANY FORM
OF ASSIGNOR, ITS AGENTS, EMPLOYEES OR CONTRACTORS,
INCLUDING SOLE NEGLIGENCE, SIMPLE NEGLIGENCE,
CONCURRENT NEGLIGENCE, ACTIVE NEGLIGENCE, PASSIVE
NEGLIGENCE, GROSS NEGLIGENCE, STRICT LIABILITY OR
WILLFULL CONDUCT OF SUCH PERSONS AND ASSERTED AGAINST
ASSIGNEE AND/OR ASSIGNOR AFTER THE EFFECTIVE DATE,)
provided that as to any claims made prior to the Effective Date, this
paragraph shall not apply. 




 The trial court made the following findings applicable to the indemnity issue:


13. The intent of DOTEPI's[ (6)] predecessor to indemnify the Faulconer
entities for the consequences of their own negligence is specifically stated
in the Purchase and Sale Agreement and the Assignment and Bill of Sale
between Faulconer Energy Joint Venture 1988 and DOTEPI's
predecessor. 


14. The indemnity provisions contained in the Purchase and Sale
Agreement and the Assignment and Bill of Sale between Faulconer
Energy Joint Venture 1988 and DOTEPI's predecessor are written so as
to attract the attention of a reasonable person to them.


15. Faulconer Energy Corporation, Vernon E. Faulconer, Inc. and
Faulconer Energy Joint Venture, 1988 are all affiliates of each other. 


17. Both parties to the Purchase and Sale Agreement and Assignment
and Bill of Sale had actual knowledge of the provisions of such contracts,
including the indemnity provisions and provisions requiring DOTEPI's
predecessor to indemnify the Faulconer Entities from the consequences of
the negligence of the Faulconer Entities.


 The trial court also filed the following relevant conclusions of law:


1. The Purchase and Sale Agreement and the Assignment and Bill of
Sale between Faulconer Energy Joint Venture 1988 and DOTEPI's
predecessor require DOTEPI to indemnify the Faulconer entities from the
cost of defending and settling the claims against the Faulconer Entities in
the Ayala Litigation and Cause No. C-4570-905-F; First National Bank et.
al. v. Phillips Properties, Inc., et. al., and Cause No. C-04568-95-D; Timely
Adventures, Inc. v. Difco, Inc, et. al., and Cause No. C-04566-95-B;
Ernesto Garza et. al. v. Phillips Properties, Inc. et. al., which were
subsequently consolidated into the Ayala litigation and Fina litigation. 


2. The Purchase and Sale Agreement and the Assignment and Bill of
Sale between Faulconer Energy Joint Venture 1988 and DOTEPI's
predecessor satisfy the fair notice requirements of express negligence and
conspicuousness. 


3. Even if the fair notice requirements of express negligence and
conspicuousness had not been satisfied by the Purchase and Sale
Agreement and Assignment and Bill of Sale, the indemnity provisions are
nevertheless enforceable because all contracting parties had knowledge
of such terms. 

 

 Dominion argues that the indemnity provision must comply with the express
negligence, conspicuousness and fair notice requirements. Faulconer claims that: (1)
the express negligence rule and related requirements do not apply to the agreements at
issue; (2) actual knowledge negates fair notice requirements; (3) the fair notice test
does not apply because the indemnity agreements do not relate to future negligence by
Faulconer; and (4) the indemnity portion of the agreement is conspicuous. 

B. Analysis

 A contract that fails to satisfy either of the fair notice requirements when imposed
is unenforceable as a matter of law. Storage & Processors, Inc. v. Reyes, 134 S.W.3d
190, 192 (Tex. 2003). One fair notice requirement, the express negligence doctrine,
requires that the intent of the parties be specifically stated within the four corners of the
document. Id. The other requirement, conspicuousness, requires that something
appear on the face of the contract to attract the attention of the person looking at it. Id. 
Language may satisfy the conspicuousness requirement by appearing in larger type,
contrasting colors, or otherwise calling attention to itself. Id. If both contracting parties
have actual knowledge of the terms, an agreement may be enforced even if the fair
notice requirements are not satisfied. Id. Actual knowledge is treated as an affirmative
defense to a claim of lack of fair notice. U.S. Rentals, Inc. v. Mundy Serv. Corp., 901
S.W.2d 789, 793 (Tex. App.-Houston [14th Dist.] 1995, writ denied) (op. on reh'g). The
burden of establishing actual knowledge is on the party seeking indemnification. Mo.
Pac. R.R. Co. v. Lely Dev. Corp., 86 S.W.3d 787, 791 (Tex. App.-Austin 2002, pet.
dism'd). Whether an agreement meets the conspicuousness requirement is a
question of law for the trial court. Dresser Indus., Inc. v. Page Petroleum, Inc., 853
S.W.2d 505, 509 (Tex. 1993). Indemnity agreements are construed under the normal
rules of contract construction. Gulf Ins. Co. v. Burns Motors, Inc., 22 S.W.3d 417, 423
(Tex. 2000). The primary goal is to determine the parties' intent. Id. 

C. Underlying Facts

 Here, the headings in the Purchase and Sale agreement were underlined. The
indemnity agreement was in a separately numbered paragraph that was titled
"Assumption and Indemnity." It was underlined. The Purchase and Sale agreement
made reference to the Assignment and Bill of Sale and it was attached to the purchase
and sale agreement as "Exhibit B". In the Assignment and Bill of Sale, paragraph B
includes language discussing indemnity set off in all capital letters. The assignment and
bill of sale was specifically referenced in the purchase and sale agreement and was also
a separately executed document. The trial court did not err in finding that the indemnity
provisions were written to attract the attention of a reasonable person and, thus, satisfy
the requirements of express negligence and conspicuousness. 

 Regardless, there was additional evidence that indemnity provisions like the ones
at issue here are common in the oil and gas industry. Malcolm Johns, former counsel
for Dominion, testified that it is very common to have indemnity provisions in such
contracts. Jean Crawley, vice-president for Faulconer stated that indemnity provisions,
such as the one at issue here, were standard. Johns also said that it would be general
practice in the industry to read and understand the contracts before executing them. 
Here, both parties initialed various parts of the agreements, showing that they were
reviewed and considered. 

 The trial court could have considered that the evidence showed knowledge of the
indemnity agreements. The parties here were sophisticated business people who were
accustomed to indemnity agreements, such as the one at issue here. The trial court
could have reasonably concluded from the evidence before it that the parties had actual
knowledge. Its findings of fact and conclusions of law are supported by sufficient
evidence.

 Dominion also argues that indemnity is not owed to any Faulconer entity except
FEJV88. (7) Tom Markel, the vice president and chief financial officer for Vernon E.
Faulconer, testified regarding the three Faulconer entities. He said that FEJV88 is a
Texas partnership. Faulconer Energy Corporation was an eighty-percent owner of the
partnership. It was the entity that owned the working interest in the pipeline system at
issue in the Ayala litigation. The operating company was Vernon E. Faulconer, Inc.,
with Vernon Faulconer as the sole stockholder. Under the Assignment and Bill of Sale,
Dominion's predecessor agreed to indemnify for those claims "arising from or
contributed to by the negligence in any form of assignor, its agents, employees or
contractors, including sole negligence, simple negligence, concurrent negligence, active
negligence, passive negligence, gross negligence, strict liability or willful conduct of
such persons and asserted against assignee and/or assignor after the effective date . . .
." Further, Dominions's predecessor agreed to "indemnify, defend and hold Seller, its
successors and assigns and their respective affiliates, directors, officers, employees,
stockholders, partners and agents harmless from and against any and all loss, liability,
liens, demands, judgments, suits and claims of any kind or character arising from such
assumed obligations or relating thereto." 

 The trial court found that Faulconer Energy Corporation, Vernon E. Faulconer,
Inc. and Faulconer Energy Joint Venture, 1988 are all affiliates of each other. Dominion
has not challenged this finding on appeal. An unchallenged fact finding is binding on an
appellate court unless the contrary is established as a matter of law or there is no
evidence to support the finding. McGalliard v. Kuhlmann, 722 S.W.2d at 696. Here,
there was evidence to support the trial court's finding and the contrary was not
established by Dominion as a matter of law. The trial court did not err in determining
that the indemnity agreement included negligence on the part of any of the Faulconer
entities. We overrule Dominion's second issue. 

V. Was there an Enforceable Settlement Agreement?

 By Dominion's third issue, it asserts that the trial court erred in holding there was
no agreement between it and Faulconer to settle the Ayala litigation because the parties
came to an agreement on all the essential terms of the joint settlement of the Ayala
litigation. Faulconer claims that it made Dominion aware, that in order to settle the
Ayala litigation, the indemnity issues of Fina had to be resolved. Dominion argues that
Faulconer's authority to settle was verbally conferred by Charles Murray, Faulconer's
counsel. On January 12, 2006, Murray sent an email to Joe Luce, who was handling
the settlement negotiations for Dominion in the Ayala litigation. The email stated: "Joe,
the authority we gave when the $15 million mediator's proposal was being considered
was 13% of the first $8 mil, 10% of the next $3 mil, and 3% thereafter up to $15 mil. 
You still have that authority. Good luck." On the same day, Luce responded to the
email as follows: "Thank you for the confirmation. I will let you know what we decide." 
Counsel for Faulconer sent additional email correspondence to Luce on January 17,
2006, affirming that the settlement had to include Fina. Dominion claims that the
foregoing initial email correspondence of January 12, 2006, was a valid contractual
agreement to settle. The trial court made a finding that Faulconer offered to contribute
to Dominion's proposed settlement fund for the Ayala litigation contingent upon
receiving a release from Fina. 

 There was conflicting evidence before the trial court. Luce testified that during
negotiations in December of 2005, no one mentioned contractual indemnities owed to
Fina. According to Luce, as of January 30, 2006, he had not heard anything with
respect to indemnity owed to Fina. He claimed that he first learned that Faulconer had
agreed to indemnify Fina on February 2, 2006. Luce stated that Fina was not discussed
at a November 2005 meeting when the defendants in the Ayala litigation met to discuss
settlement of the Ayala litigation. Gilbert Hinojosa, Dominion's expert, testified that Fina
was only mentioned at the end.

 James Dyer, counsel for Faulconer, testified that he recommended to his client
that it not settle unless the agreement included Fina. He stated that during the
November 2005 meeting with the defendants in the Ayala litigation, he discussed the
necessity of Fina being settled at the same time as everything else. Markel,
Faulconer's, vice-president, testified that at the November 2005 meeting, two of
Faulconer's attorneys urged that it should not settle without Fina. He also said that "we
laid out the formula and details about Fina to them (Dominion) at that time." Jean
Crawley, vice-president of land and administration for Faulconer also testified that at
least after November 22, 2005, Fina had to be included in any settlement. She said that
at that meeting it was made clear to Dominion that Faulconer agreed to pay a portion of
the settlement in the event that Faulconer could settle its claims with Fina. 

B. Relevant Law

 Texas Rule of Civil Procedure 11 prohibits enforcement of any agreement unless
it is in writing. Tex. R. Civ. P. 11. In order to satisfy rule 11, the writing must contain all
of the essential elements of the agreement. Padilla v. LaFrance, 907 S.W.2d 454, 460
(Tex. 1995). 

 Dominion urges that as a matter of law the email correspondence between Luce
and Murray on January 12, 2006, constitutes a binding agreement which set forth the
essential terms of the agreement. It argues that it was only after the plaintiffs accepted
the settlement offer that Faulconer decided that Fina had to be part of the settlement. 
There was evidence that the inclusion of Fina as part of the settlement offer was
discussed in November 2005. The email sent by Luce refers to an agreement by
Faulconer to participate. It does not state what Faulconer was getting in return by way
of release. It does not specify whether it is only a release from the Ayala claims or from
both the Ayala and Fina claims. 

 There was evidence before the trial court that a release from Fina had been
previously discussed. The trial court could have chosen to believe that testimony. The
email correspondence between Luce and Murray does not mention releases at all. The
trial court could correctly have determined that all of the essential terms had not been
reduced to writing and the rule 11 agreement was not an enforceable contract. See
Padilla, 907 S.W.2d at 460. We overrule issue three. 

VI. Cross Appeal

A. Background

 Faulconer contends by cross-appeal that the trial court incorrectly determined
that prejudgment interest began to run in May 2006. It claims that prejudgment interest
should have begun to accrue 180 days after it gave notice of its indemnity claim on April
15, 1996. Dominion asserts that Faulconer has completely ignored the fact that the
1996 notice of claim was made prior to and resulted in a 1998 lawsuit, filed in federal
court, that was later settled and dismissed. 

 The trial court awarded Faulconer $2,167,342.33 in this case. With respect to
prejudgment interest, the trial court found "in March of 2006 DOTEPI and Faulconer
exchanged letters concerning the continuation of DOTEPI providing a defense for
Faulconer in the lawsuit. Notice that DOTEPI failed to continue defending was given
March of 2006." The trial court concluded that Faulconer was entitled to prejudgment
interest beginning May 19, 2006, the day the lawsuit was filed. 

B. Standard of Review and Applicable Law

 The trial court's prejudgment interest award is reviewed under an abuse of
discretion standard. See Wilmer-Hutchins Indep. Sch. Dist. v. Smiley, 97 S.W.3d 702,
706 (Tex. App.-Dallas 2003, pet. denied). To determine if a trial court abused its
discretion, we must decide if the trial court acted without reference to any guiding rules
or principles. See Downer v. Aquamarine Operators, Inc. 701 S.W.2d 238, 241-42 (Tex.
1985). A claim for prejudgment interest may be based upon general principles of equity
or an enabling statute. Cavnar v. Quality Control Parking, Inc., 696 S.W.2d 549, 552
(Tex. 1985). Under both the common law and the Texas Finance Code, prejudgment
interest begins to accrue on the earlier of: (1) 180 days after the date a defendant
received written notice of a claim, or (2) the date suit is filed. Tex. Fin. Code Ann. §
304.104 (Vernon 2006). Prejudgment interest is awarded to fully compensate the
injured party, not to punish the defendant. See Johnson & Higgins of Tex., Inc. v.
Kenneco Energy, Inc., 962 S.W.2d 507, 528 (Tex. 1998); see also Trujillo v. Burrows,
No. 13-08-291-CV, 2009 WL 866827, *2 (Tex. App.-Corpus Christi, Apr. 2, 2009, no
pet.) (mem. op.). It is considered compensation allowed by law as additional damages
for lost use of the money due between the accrual of the claim and the date of
judgment. Kenneco Energy, Inc., 962 S.W.2d at 528.
C. Analysis 

 The trial court awarded prejudgment interest in this case based upon what it
believed the correct statutory interpretation. The trial court's fact findings confirmed that
the award was calculated based upon the date this suit was filed, May 19, 2006. 
Faulconer argues that it is entitled to prejudgment interest based upon litigation that
ensued in 1998 between it and American, Dominion's predecessor. American agreed to
provide a defense to Faulconer and that case settled in 1999. As part of the settlement
agreement, American agreed to delay further litigation on its indemnity obligation and
reserved certain rights. There does not seem to be a dispute that there was a notice of
Faulconer's claim in 1996. Dominion argues that the notice in 1996 may not be used to
calculate the accrual of prejudgment interest because the case at issue here is a
different case. We agree. 

 There was evidence that Faulconer had incurred $80,502.74 in costs in
defending the Ayala litigation to the point where the original case settled. Faulconer
reserved its right to seek payment in future litigation that it had incurred up to that time. 
Faulconer had the right to file suit against Dominion to recover those fees. However, to
do so, it had to file a new cause of action because its previous case had settled. We
agree with the trial court's decision to grant prejudgment interest based on the filing of
the second lawsuit. It was a new claim, even though it was based on rights that had
been previously reserved. We overrule Faulconer's cross issue.

VII. Conclusion

 The judgment of the trial court is affirmed.


 

 ROSE VELA

 Justice


Delivered and filed the

31st day of August, 2010.
1. [1]The Ayala litigation was brought by a group of plaintiffs who claimed that their property was damaged by
pollution caused by leaking natural gas pipe lines. One of the Faulconer entities operated the pipeline
from 1989 to 1993. Dominion was the previous owner of the same pipeline for two years. The Ayala case
was styled in the trial court as cause no. C-4597-92-C; Eva Reyna Ayala, et al v. Phillips Properties, Inc.,
et al. 
2. [2]American eventually merged with Louis Dreyfus Natural Gas and American ceased to exist. There was
another merger and the resulting entity is Dominion, the appellant herein. 
3. [3]In 2001, several hundred additional plaintiffs intervened in the lawsuits involving the pipelines. Fina and
Faulconer had previously entered into an indemnity agreement in 1989. In 2002, Fina was sued and
settled with sixty-five plaintiffs for $250,000. Fina was later brought back in to the litigation. This
indemnity obligation becomes important with respect to the later negotiations between Faulconer and
Dominion.
4. [4]The Fina litigation was styled trial court cause no. C-2000-02-F; TotalFinaElf E&P USA, Inc. and
ATOFINA Petrochemicals, Inc. v. Vernon E. Faulconer, Inc.
5. [5]As noted in the factual background in this opinion, American Exploration Company was Dominion's
predecessor in interest.

6. [6]The parties often refer to Dominion as DOTEPI. 
7. [7]This entity was the joint venture that actually entered into the agreement.